[Civ. No. 48511. Second Dist., Div. Three. Feb. 25, 1977.]

In re GEORGE G. et al., Minors.
DEPARTMENT OF ADOPTIONS OF LOS ANGELES COUNTY,
Petitioner and Respondent, v.
DANIEL G. et al., Defendants and Appellants.

148

**COUNSEL**

David A. Binder, Paul Bergman, Paul Boland, Ronald Marks and Judy Bakal for Defendants and Appellants.

John H. Larson, County Counsel, and Lester J. Tolnai, Deputy County Counsel, for Petitioner and Respondent.

**OPINION**

POTTER, J.—Daniel and Nellie G., parents of minors George G. and Baby Girl G.,[1] appeal from the judgment of the superior court terminating their parental rights to the aforesaid minors on the ground of voluntary abandonment. On January 8, 1975, a petition was filed by the Los Angeles County Department of Adoptions (hereinafter petitioner) alleging that George G. and Baby Girl G. were persons defined in Civil Code section 232, subdivision (a)(1), in that they have "been left in the care of the Department of Public Social Services without any provision for their support, and without communication from their said parents, with the intent on the part of said parents to abandon [George G.] continuously since Spring 1968 [and Baby Girl G. since April 26, 1974] to the time of filing this petition." As additional facts the petition alleged:

---

[1] At the time the petition was filed George G. (born July 22, 1965) was nine and one-half years old and Baby Girl G. (born April 20, 1974) was eight months old. The parents had two other minor children, Daniel, Jr. (born in 1964) and Francine (born in 1973) who were not subjects of any judicial proceeding.

"In Spring, 1968 minor George was voluntarily placed by his parents with non-relatives who were subsequently licensed as George's foster parents. On 4/26/74 Baby Girl . . . was voluntarily placed with the County after being born addicted to herion [*sic*]. Both minors remain in the County's care. Since their respective placements the minors' parents have not supported nor communicated with the minors except for sporadic token contact with George. . . . [¶] The whereabouts of the minors' parents are unknown. [¶] The Department can provide immediate adoptive planning for George and suitable adoptive planning for Baby Girl . . . ." Petitioner sought to have the minors declared free from custody and control of their parents and the minors' custody awarded to petitioner.

On May 29, 1975, the hearing on the above petition commenced and was subsequently continued through June 2 and June 8. A probation officer's report, filed on March 17, 1975, pursuant to Civil Code section 233, was received in evidence. The report recommended that the petition be sustained. The probation officer was called to testify by the parents. When questioned concerning the source of the information in the report, the officer testified that virtually all of the material concerning the minors' history, and the parents' history was based on his paraphrasing of Department of Public Social Services (hereinafter DPSS) records.[2] The only exceptions were references to the parents' arrest history based on police arrest reports which were stricken pursuant to parents' motion, and two statements based on personal knowledge that "THE PROBATION OFFICER VISITED [George's foster parents'] HOME MARCH 11, 1975" and "SENT A LETTER [apparently to the parents] REQUESTING AN INTERVIEW BUT RECEIVED NO RESPONSE."[3] Parents' repeated motions to strike those portions of the report relying on the DPSS records on the grounds of hearsay and lack of personal knowledge were denied. Counsel further

[2]This included, inter alia, such statements as that since 1968, George had lived with Mr. and Mrs. A and "THE PARENTS VISITED THE MINOR [George] ABOUT ONCE EVERY FIVE MONTHS. . . . VISITED THE MINOR ON AUGUST 3, 1974, AND TOOK HIM HOME WITH THEM FOR THREE DAYS AT THANKSGIVING AND FIVE DAYS AT CHRISTMAS IN 1974. . . . [¶] THE NATURAL PARENTS HAVE NEVER SUPPORTED OR VISITED THE MINOR [Baby Girl G.] OR EVEN INQUIRED OF THE DEPARTMENT OF PUBLIC SOCIAL SERVICES OF HER PLACEMENT."

[3]The court, upon parents' motion, struck as hearsay the remainder of the sentence regarding the visit because it contained what the foster mother had purportedly said to the officer. Since it was stricken, such testimony is not at issue herein. The court also noted that the section of the report entitled EVALUATION (containing references to only sporadic and token visitation of George G., and desertion of Baby Girl G. at birth followed by failure to visit, support or inquire) was "not considered as evidence and to that extent is stricken from the previous set of the report in evidence."

objected: "There is one additional point I'd like to make for the record . . . and that is, your Honor, that with respect to these things so far as they come from DPSS reports, there's no way that the citee could possibly cross-examine the origin. Mainly, they're the reports." At this point, the court apparently interrupted counsel. The court stated: "That is not correct. The records could be tested. That's why the Court considers it goes to the weight of it. As touched on by counsel for the petitioner, Section 233 contemplates an officer who is mandated by an agency albeit of the same government is separate from that of the petitioner who will go out and do things like look at records at various places. The cases indicate that he who prepares the report must be available for examination on cross. So, that if he has done a defective job, the report or parts of it can be attacked, possibly be stricken or possibly be given little or no weight, . . . [¶] *We would have absolute chaos and a proceeding so cumbersome as to be completely inconsistent with the best interests of the minor child were every scintilla of public information to be brought in as it is sometimes required in connection with ordinary civil proceedings.*" (Italics added.) Counsel for citees did not press the matter further.

The only evidence presented by petitioner concerning the abandonment of George G. was in that probation report. The petitioner did call the adoptions worker and the DPSS worker to testify. The adoptions worker stated the cases of both minors were transferred to adoptions on April 30, 1974, (10 days after the birth of Baby Girl G.) but disclaimed any knowledge of the presence or lack of parental contacts with the minors. The DPSS worker testified only regarding the placement of the baby.

The facts regarding the alleged abandonment of Baby Girl G., as testified to by the parents, their witnesses and the DPSS worker, were as follows: On April 20, 1974, the mother gave birth to Baby Girl G. At the time of the birth both parents were heroin addicts and had outstanding warrants for their arrest since August 1973, for violations of probation. The mother left the hospital the day after the birth without a medical release. She did, however, make arrangements for the baby to be picked up by a member of the immediate family. On April 23, the maternal grandmother, Mrs. L., who was already caring for Daniel, Jr. and Francine, the two siblings of the minors in the case herein, contacted the hospital and informed the medical social worker that she or the mother would pick up the baby when she was ready to be discharged. The hospital had claimed it had to temporarily retain the baby to watch for possible withdrawal symptoms and detoxification problems because the

mother was an addict. A day or two after the grandmother had contacted her, the hospital medical social worker called the DPSS worker, Sheila W., and informed her of the birth of the baby and the family's discharge plan. The DPSS worker told the medical worker that "the baby shouldn't be going to the mother or the grandmother," "there was already an open case," and the police should be informed. The DPSS worker arranged with the police to place a police "hold" on the baby. On April 26, the DPSS worker picked up the baby from the hospital and immediately placed her in a foster home. On April 29, the grandmother, having been informed by the hospital that the baby had been removed, contacted the DPSS worker and requested custody.[4] The DPSS worker refused on the ground that a detaining petition was being filed. It was stipulated at trial, however, that no petition pursuant to Welfare and Institutions Code section 600 was ever filed. On April 30, the case was transferred from the DPSS to petitioner adoptions department without any notification to the family. The DPSS worker claimed she was unsuccessful in her attempts to locate the parents subsequent to the baby's birth.[5] The parents testified they did not contact her for fear of arrest. The DPSS worker in her contacts with the grandmother had stressed the parents', outstanding arrest warrants and indicated the grandmother could be arrested for "harboring" them. The mother did, however, contact her former DPSS worker and other social workers inquiring after the condition of the baby. On February 3, 1975, the grandmother was first served with a citation notifying her of the forthcoming proceedings to free both minors for adoption placement. She again called the DPSS worker to protest and asked "why . . . they were up for adoption if the baby had a very large family."

The parents, grandmother, maternal uncle and a friend testified to frequent contacts and visits with George G., at least bimonthly, except for two periods: (1) when the mother was incarcerated; and (2) during a

[4]The mother and grandmother were apparently in contact. The mother who had voluntarily checked herself into Metropolitan Hospital for detoxification called the grandmother to find out how the baby was doing and was informed that the DPSS had taken the baby. The mother left the hospital soon thereafter and apparently often stayed with her mother.

The grandmother claimed that the DPSS worker told her she "couldn't have the baby because the baby was abandoned" and therefore "had to be placed in a foster home." The grandmother told the DPSS worker "the baby was not abandoned because the baby had to stay in the hospital for a period of time and that [her] daughter had told [her] that [she] could pick up the baby."

[5]The petitioner also attempted to contact the parents by mail. A certified letter, May 29, 1974, was apparently received by the mother.

one and one-half month trip to New Mexico taken by the parents. In 1968 the mother had first begun leaving George G. with Mrs. A. (whose son was a friend of the natural parents) as a babysitter because of the mother's working and the father's addiction. Mr. and Mrs. A. never requested support for George G. In 1972 the parents agreed to voluntary placement of George G. in the A's home as licensed foster parents so that the A's could receive public funds for his care. The mother thereby apparently relinquished her rights to AFDC funds. The county paid for his care. In 1972 he had returned home for several months but the parents' problems (e.g., addiction) caused them to place him again with the foster parents. After the filing of the 232 petition (Jan. 1975), the visiting and weekends at the home of the natural parents may have decreased,[6] since the petitioner informed the foster parents, by means of an official notification citation, that they were not to permit the parents to visit without a court order pending the trial.

Other testimony adduced at the trial disclosed that in September, 1974, the parents had voluntarily and apparently successfully enrolled in an approved methadone treatment program and in April 1975, having voluntarily turned themselves into the appropriate criminal court were reinstated on probation. At the time of trial, the father was employed and the parents had their own apartment.

On June 18, 1975, the court ordered that the petition be sustained. The court, in its minute order, further stated:

"As to the problem raised by the defense with respect to the failure of the DPSS to file a petition pursuant to § 600 of the Welfare and Institutions Code concerning the youngest child, the Court has concluded that although it was a violation of law to so act, it was a technical violation that should not be permitted to defeat the granting of this petition, . . .

"There is no question but that a § 600 petition would have been granted 'out of hand' as to the baby.

". . . . . . . . . . . . . . . . . . .

"If the Court were to permit the technical law violation to defeat this petition, as to the youngest child, it would be required to conclude that

[6]The record is not clear whether there was an actual decrease. The parents testified to decreased visiting. Mrs. A., however, at a subsequent hearing on visitation rights, indicated increased visiting in 1975.

only by such harsh measures could the DPSS be forced to comply with the law. No foundation for such conclusion exists. This Court has reviewed hundreds of probation reports relating to children subject to CC 232 proceedings. This is the only case which has come to the Court's attention wherein the DPSS removed a newborn child from the hospital and placed the child in protective foster placement without filing a § 600 W&I petition and obtaining an order thereunder. . . .

"Another way of stating the above is to say that the legal concepts that support certain of the procedural rules in the criminal law field, as a means of controlling law enforcement procedures by police agencies, should not be applied in this case."

On June 27, 1975, parents filed a request for written findings of fact and conclusions of law. The request was denied.

On July 1, 1975, the parents filed a notice of motion for visitation rights with respect to George G. pending appeal. On July 2 and 8, 1975, the court held hearings on the motion. The foster mother and would-be adoptive parent, Mrs. A., testified that the parents had maintained contact with George G. over the years, he "was knowing" of them, and very close to his brother Daniel with whom he often spent weekends either at the foster parents' or the natural parents' residence. In response to the court's inquiry about lack of contact in 1974, Mrs. A. stated there was contact "on and off throughout the year," and the natural parents "called to have George visit them on occasions like birthday parties," family gatherings, and weekends or overnight. Since Christmas 1974, the contact had increased to an average of "twice a month" and included extended visits such as the July 4th week. At the conclusion of the proceedings the court issued an order granting the natural parents visitation rights with George G. "every other weekend . . . including the right to keep the child overnight together with additional reasonable times during summer and Christmas and spring vacations. . . " pending appeal.[7]

On July 15, 1975, the judgment of the court was entered. The court stated that it had "read and considered" the written probation report and "rendered its decision in favor of petitioner and against" the parents "on all issues under California Civil Code section 232 (a)(1)." The court

---

[7]The court further ordered the record augmented to include the transcript of the visitation proceedings.

found and adjudged that: (1) an award of custody of the minors to the parents, or either of them, "would be detrimental" to the minors; and (2) the minors' "best interests and welfare" required an award of custody to a nonparent, to wit, petitioner, with whom the minors should remain for purposes of adoptive planning and placement. On July 31, 1975, the parents filed their appeal from the above judgment sustaining the petition and awarding custody to the petitioner.

### Contentions[8]

Parents contend: (1) the court's erroneous evidentiary rulings with regard to the probation report (a) violated the hearsay rule and (b) denied parents due process of law; and (2) the evidence does not support the abandonment of Baby Girl G. because there was no voluntary leaving as required by statute. (Civ. Code, § 232, subd. (a)(1).) Petitioner controverts the contentions and contends substantial evidence and the best interests of the minors support the judgment.

### The Probation Report Was Not
### Inadmissible Hearsay Evidence

■ Parents attack the court's evidentiary ruling denying the motion to strike those portions of the probation report based on DPSS records on the grounds of hearsay and lack of personal knowledge. Parents contend the report contained multiple hearsay and was inadmissible, under Evidence Code section 1201. We disagree. A similar contention was rejected in *In re Rose G.,* 57 Cal.App.3d 406 [129 Cal.Rptr. 338]. That court noted (57 Cal.App.3d at p. 425, fn. 5): "Civil Code section 233 provides, in pertinent part, that in section 232 proceedings '[t]he court shall receive such report in evidence and shall read and consider the contents thereof in rendering its judgment.' Evidence Code section 1200 provides for admissibility of hearsay evidence meeting the conditions of an exception to the hearsay rule created by *statute* or *decisional law.* Exceptions to the hearsay rule may thus be found in other codes as well as in the Evidence Code. (See the Senate Committee on Judiciary's Comment to Evid. Code, § 1200.)" Moreover, there is nothing in the language of Civil Code section 233 which limits the admissibility to

---

[8]Parents also contend the evidence did not support the abandonment of George G., the requested written findings of fact and conclusions of law should have been granted, and the court should have asked George G. for his preferences. Since we have concluded we must reverse, we have not discussed these other contentions.

single hearsay. As the *Rose G.* court explained (57 Cal.App.3d at p. 426): "A probation report is itself hearsay evidence as it constitutes the hearsay statements of the probation officer. To the extent that it relates statements made by others to the probation officer, it constitutes double and sometimes multiple hearsay. Civil Code section 233 makes a probation report admissible in proceedings related to the welfare of children because of the necessity of providing the court with a coherent picture of the child's situation. . . . There is nothing in the statute which indicates a limitation on admissibility of a probation report to statements of the probation officer relating facts within his own personal knowledge." The court, therefore, did not err in denying parents' motion to strike.

### *Parents Were Denied Their Due Process Right to Adequate Cross-Examination*

Parents contend, and we agree, that the court's evidentiary rulings regarding the use of the probation report prepared pursuant to Civil Code section 233[9] operated to deny them due process of law. Parents claim that they were effectively deprived of their right to cross-examine the officer.

It is clear, as petitioner concedes, that due process requires that a litigant be afforded an opportunity to controvert the content of the probation report filed pursuant to Civil Code section 233. In *Long* v. *Long,* 251 Cal.App.2d 732, 736 [59 Cal.Rptr. 790], the court pointed out the constitutional requirements for admissibility of a probation report prepared pursuant to Welfare and Institutions Code section 582. In stressing that these probation reports are hearsay evidence which "accentuates the need to carefully protect the rights of the parties affected by them," the *Long* court explained (251 Cal.App.2d at p. 736): ". . . Due process of law requires that each party (a) receive a copy of the

---

[9]Civil Code section 233 provides in pertinent part that upon the filing of a petition for an order or judgment declaring a minor free from the custody and control of his parents, ". . . the clerk of the court shall, in accordance with the direction of the court, immediately notify the juvenile probation officer, . . . who shall immediately investigate *the circumstances of said minor person and the circumstances which are alleged to bring said minor person within any of the provisions of Section 232. The juvenile probation officer* or the county department *shall render to the court a written report of the investigation with a recommendation to the court of the proper disposition to be made in the action in the best interests of said minor person. The court shall receive such report in evidence and shall read and consider the contents thereof in rendering its judgment."* (Italics added.)

report, (b) *be given an opportunity to cross-examine the investigative officer and to subpoena and examine persons whose hearsay statements are contained in the report,* and (c) be permitted to introduce evidence by way of rebuttal. . . . [¶] To deny a litigant the right to cross-examine a witness who testifies against him is a denial of due process of law. (*Ceasar's Restaurant* v. *Industrial Acc. Com.,* 175 Cal.App.2d 850 [1 Cal.Rptr. 97]; *Fewel* v. *Fewel,* 23 Cal.2d 431, 436 [144 P.2d 592].) The error is compounded when hearsay evidence directly contradicts testimony given under oath in open court and in the presence of the litigant." (Italics added.)

While the *Long* court was speaking of reports prepared pursuant to Welfare and Institutions Code section 582, the reasoning has been held equally applicable to custody investigations pursuant to Civil Code section 4602. (*Wheeler* v. *Wheeler,* 34 Cal.App.3d 239, 242 [109 Cal.Rptr. 782].) The above cases only involved temporary, modifiable custody awards. Clearly, then, the procedural protections and guarantees, set out in *Long,* would be essential in a case such as the one herein, where parents face permanent termination of all custodial rights.

In the case at bench, the parents were theoretically afforded the right to cross-examine the probation officer on the report. That right, however, was rendered meaningless when, after the officer disclosed that the source of all the pertinent information recorded in the report was his paraphrasing of unspecified DPSS records, the court refused to provide the parents access to the source.

The record reflects that when counsel for citees attempted to object that "so far as they come from DPSS reports, there's no way that the citee could possibly cross-examine the agency," the court interrupted counsel. The court then made a lengthy statement in which it concluded that there would be "absolute chaos" and a too "cumbersome" proceeding if "every scintilla of public information were to be brought in as it is sometimes required in connection with ordinary civil proceedings."

The clear import of the court's statement was that the court would not require production of the DPSS records. Counsel should, perhaps, have made a formal demand at that point for production of the DPSS reports upon which the probation report was based. Counsel may, however, have considered such a demand would be impolite after the court's ruling. We will, therefore, treat the matter as if a formal demand had been properly made and denied.

The court's ruling deprived parents of the opportunity for adequate cross-examination. In order to effectively cross-examine the officer and test the accuracy and reliability of the information in the report, they needed access to the specific DPSS records upon which the report was purportedly based, so they could compare the paraphrased material with the original documents. Moreover, examination of the specific documents utilized by the investigative officer in preparing his report was necessary to ascertain those persons whose hearsay statements formed the underlying basis for the report and should, therefore, be subpoenaed to testify.[10] In addition, the due process error was further compounded because the probation report's hearsay evidence which was the sole evidence presented by petitioner concerning abandonment directly contradicted the testimony of five witnesses on the issue of parental communication with George G. (*Long* v. *Long, supra,* 251 Cal.App.2d at p. 736.)

Civil Code section 232, subdivision (a)(1), sets forth the grounds upon which parental rights can be terminated for voluntary abandonment. The statute provides in pertinent part:

"(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents . . . .

"(1) Who has been left . . . by his . . . parents . . . in the care and custody of another for a period of six months . . . without any provision for his support, or without communication from such parent or parents, with the intent on the part of such parent or parents to abandon such person. Such . . . failure to provide, or failure to communicate shall be presumptive evidence of the intent to abandon. . . . If in the opinion of the court the evidence indicates that such parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by such parent or parents. . . ."

---

[10]George's foster mother was not called to testify at the trial. Had the specific DPSS records relied on by the probation officer been examined, they might have disclosed that some of the information supporting lack of parental visitation purportedly came from statements by her. She could then have been called to testify. Judging from her testimony at the post-trial hearing on visitation rights, her testimony would have supported parents' claim of frequent contact and undercut the charge of abandonment.

There was evidence that the parents did not provide support for George G. ■ There was, however, no demand for support,[11] and failure to contribute to support in the absence of demand does not prove an intent to abandon. (See *In re Adoption of R.R.R.,* 18 Cal.App.3d 973, 981 [96 Cal.Rptr. 308] and cases cited therein.)

As for failure to communicate, the only evidence supporting the abandonment of George G. would be the probation officer's report. The witnesses all testified to a minimum of twice monthly visits between the parents and George G. On the other hand, the probation report, which the court stated it had read and considered, charged there was visitation only once every five months between 1968 and 1974, at Thanksgiving and Christmas in 1974, and a few times in 1975. To support its findings of abandonment, the court must have relied on the evidence in the probation report to find that the paucity of contact merely constituted token efforts to communicate. (See, e.g., *Adoption of Oukes,* 14 Cal.App.3d 459, 466 [92 Cal.Rptr. 390]; *In re Gano,* 160 Cal.App.2d 700, 709-710 [325 P.2d 485].)

■ The erroneous denial of cross-examination regarding the probation report thus related to the mainstay of petitioner's case on the issue of abandonment. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Accordingly, the due process violation herein was not harmless and the order with respect to George G. must be reversed.

### Baby Girl G. Was Not Abandoned

■ Parents contend that Baby Girl G. was not abandoned. Parents claim that one of the essential requirements of Civil Code section 232, subdivision (a)(1), has not been satisfied because Baby Girl G. was "taken" not "left in the custody of another" and was illegally detained. Parents argue, in effect, that no intent to abandon can be found because

[11]The fact that George G. was voluntarily placed in a foster home and supported through public funds would not affect "intent to abandon" under section 232, subdivision (a)(1), because: (1) There was probably no financial ability to support since when the parents voluntarily placed George G. so the A's could get AFDC funds, both parents were heroin addicts and the family was apparently on welfare; and (2) an action to free for adoption because of foster home placement would have to be brought under section 232, subdivision (a)(7).

petitioner failed to show a shift from the initial parental attitude of nonconsent to voluntary consent followed by a six-months abandonment period. Petitioner responds that even if the initial taking were involuntary this taking was converted into a leaving by parental inaction, especially in view of the legislative intent to liberally construe the statutory provisions in an action to declare a minor free from parental custody and control (Civ. Code, § 232.5). We have examined the record and conclude on the facts of this case that the involuntary taking and subsequent actions and relative positions of the parties preclude a determination that Baby Girl G was abandoned by her natural parents.

Civil Code section 232, subdivision (a)(1), previously cited, provides that if a child *has been left in the custody of another* for a six-months period without communication or support with parental intent to abandon, the child may be declared abandoned. (Italics added.) In *Matter of Cozza,* 163 Cal. 514 [126 P. 161], our Supreme Court first declared the rule that this leaving must be voluntary and abandonment does not occur when the child is taken from parental custody against the parent's wishes.

The *Cozza* court, in construing an earlier version of the code section at issue herein, stated (163 Cal. at pp. 528-529):

"Abandonment has a well-defined legal meaning. As said in *Guardianship of Snowball,* 156 Cal. 240, 243, [104 Pac. 444, 446]: 'In order to constitute abandonment there must be *an actual desertion,* accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' To constitute abandonment there must be an intention to do so, express or implied, from the conduct of the parent respecting the child. This is the character of abandonment contemplated by the very terms of section 224 as far as they are applicable or are relied on in this proceeding. *It contemplates a case where a child has been voluntarily surrendered or left* for a year *in the care and custody of another* without any agreement or provision for its support. This is not the situation here. The care and custody of this child was not so left by the mother with either Mrs. Merriman or the petitioners for adoption. It was taken away from her and placed in the custody of the former by order of the juvenile court (whether valid or not is immaterial to this inquiry) without the consent of the mother and against her wishes and desire. It was taken from her under process of court—by force of law—invoked or, at least, employed

for the very purpose of depriving her of the custody of the child, and such custody has been withheld from her all along by virtue of the assumed authority of the juvenile court to do so. Since taken from her, she has endeavored, through her personal efforts and those of her relations, to secure the return of the child. . . .

"The findings of the superior court, both as to desertion and abandonment, are not sustained by the evidence." (Italics added.)

This principle was recently reiterated by the Supreme Court in *In re Lisa R.,* 13 Cal.3d 636, 646 [119 Cal.Rptr. 475, 532 P.2d 123], certiorari denied 421 U.S. 1014 [44 L.Ed.2d 682, 95 S.Ct. 2421], when the court stated that to find the minor abandoned by her natural parents, "[i]t would have been necessary for the court to have found that *both* of such persons had left Lisa in the care and custody of another within the meaning of Civil Code section 232, subdivision (a), as it then provided. *A child taken from a parent by judicial order was not . . . deemed to have been left in the care and custody of another within the meaning of the statutory provision relied upon.* [Citations.] It also would have been necessary for the court to have found that both of Lisa's parents intended to abandon her . . . ." (Italics added.)

The element of "leaving" has been discussed in appellate decisions subsequent to *Cozza.* In *In re Cattalini,* 72 Cal.App.2d 662 at page 665 [165 P.2d 250], the court said: " . . . According to Webster's International Dictionary, 'leave' means 'to put, deposit, deliver, or the like, so as to allow to remain;—with a sense of withdrawing oneself from; as *leave* your hat in the hall; we *left* our cards.' Thus the term appears to connote voluntary action. Therefore, it may not be said that appellant left his children in the care and custody of the respondent when, by an order of the court, they were taken from the joint control of their parents and placed in the sole care and custody of the mother."

In *In re Jones,* 131 Cal.App.2d 831 [281 P.2d 310], custody had been taken from the mother and given to the father with the mother retaining reasonable visitation rights. The court held that the failure of the mother (who apparently was mentally ill) to communicate with the child subsequent to the custody award did not conclusively establish her intent to abandon because the child had been taken under force of law and "[a]bandonment is not established by acts of relinquishment committed under circumstances of coercion." (*Id.,* at pp. 834-835.)

Our research reveals no cases, nor were any cited to us, like the case herein where the authorities who removed a child from the parents' custody and against their wishes did so without judicial authority. Clearly, however, if a judicial "taking" does not satisfy the element of "leaving" and extrajudicial "taking" should not.

Although under *Cozza*, it is settled that Civil Code section 232, subdivision (a)(1), applies only to a voluntary leaving, and, therefore, is not applicable where custody has been removed by judicial decree, some appellate courts have held, as petitioner contends, that "nonaction of the parents" after such a judicial decree "may convert into a leaving (and, the other elements present, into an abandonment) that which initially could not be regarded so." (*In re Conrich*, 221 Cal.App.2d 662, 666 [34 Cal.Rptr. 658].) Thus, in *Conrich*, the court found the child was abandoned where not only had there been a "total lack of inquiry" by the natural parents subsequent to the adjudication of wardship but the natural parents conceded they did not wish to recover the child's custody for themselves and in fact, failed to appear in person or by deposition at the abandonment hearing. In *In re Maxwell*, 117 Cal.App.2d 156, 165 [225 P.2d 87], the court upheld the declaration of abandonment where a three-year period of nonaction by the parents had elapsed since the child was made a ward of the juvenile court. (See also *In re Barton*, 168 Cal.App.2d 584, 588 [336 P.2d 210].)

In the case herein, the parents had not voluntarily relinquished custody of Baby Girl G. She was left in the hospital in accord with the hospital's plan for observation for detoxification symptoms. Plans were made by the parents and grandparent to pick up the baby as soon as the hospital would release her. The DPSS social worker knew of those plans but instead arranged for a police "hold" to prevent the family receiving the baby, personally removed the baby placing her in a foster home and refused the grandmother's request, in accord with the parents' wishes, for custody. Like the mother in *Cozza*, the parents through the agency of the grandmother, endeavored in vain to secure the release of the baby to them. The parents, here, however, were also under the additional disadvantage of fear of arrest if they contacted the DPSS worker to inform her of their whereabouts. Although this fear might not have been warranted, it is understandable in view of the DPSS worker's expressed unwillingness to allow the mother or grandmother to obtain the baby and references to the mother's outstanding arrest warrants.

Moreover, unlike the cases heretofore cited where parental inaction was transformed into a leaving, the parents in the instant case were never afforded the opportunity to judicially contest the original removal from custody because of the illegal action of the authorities. The DPSS worker claimed the grandmother could not have the baby because a section 600 petition was being filed. Such a petition was required by law. (See Welf. & Inst. Code, §§ 628, 630.) But no petition was ever filed and the case was transferred to petitioner adoptions department.

The trial court deemed this failure to file the requisite petition a mere technical violation of law and apparently contrasted the situation herein with that presented in a criminal trial where there is a need for procedural guarantees to zealously guard the defendant against possible police abuse by deterring police agencies from illegal action. We note, however, the fundamental nature of the rights herein involved and recognize the need also to protect individuals against bureaucratic abuse or error. As was pointed out by our Supreme Court in *In re B. G.*, 11 Cal.3d 679, 688-689 [114 Cal.Rptr. 444, 523 P.2d 244]: "Since the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights (*Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208]; *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901 [97 Cal.Rptr. 158]), the state, before depriving a parent of this interest, must afford him adequate notice and an opportunity to be heard."

The parents herein were not afforded that opportunity. If the petition had been filed, notice would have had to be given to the grandmother. (See Welf. & Inst. Code, §§ 630, 656, subd. (e), 658.) In view of the grandmother's previously rejected request for the baby's custody and her subsequent complaint upon receipt of the adoption citation to the same DPSS worker against putting the baby up for adoption when her own large family wanted her, we cannot presume the grandmother or the parents would not have contested the court's jurisdiction and sought custody at the section 600 proceeding. Even if the grandmother were not granted custody, the family members would at least have been informed of the baby's location, their possible visitation rights, and their rights to appeal the decision, to have an annual review of the adjudication and to petition for termination of jurisdiction.

Furthermore, if the court had taken jurisdiction pursuant to section 600, the 600 petition would probably have been sustained on the ground of the parents' heroin addiction or general parental neglect. In either case, the parents would have had one year after the judicial deprivation

of custody (not the six months herein) prior to the filing of the 232 petition in which to rehabilitate themselves and regain custody. (Civ. Code, § 232, subds. (a)(2), (3).)[12]

It was the failure on the part of the government authorities to follow the required legal procedures which prevented the parents from having these guaranteed opportunities of demonstrating their intention not to abandon their child. The state through the petitioner, therefore, should not be permitted on such slight showing of lack of contact once the baby was taken to prevail on its claim that the original involuntary taking was converted by parental nonaction into a leaving.

Nor are we convinced by petitioner's argument that the *Cozza* rule depends upon the former strict construction of the abandonment statute then in force and therefore the "inaction" exception should be applied herein to uphold abandonment under the present liberal interpretation of the statute mandated by the 1965 passage of Civil Code section 232.5.[13] We recognize that the 1965 statute and the case law interpreting it call for a liberal construction to consider the welfare and best interests of the child, and not just proprietary parental rights. (Civ. Code, § 232.5; *In re Eugene W.,* 29 Cal.App.3d 623, 629 [105 Cal.Rptr. 736].) A best interests test would not, however, necessarily indicate legislative support for converting an involuntary taking, with or without the safeguards of judicial adjudication, into a voluntary abandonment under these facts.

Moreover, in construing even more recent legislation, the 1969 Family Law Act (Civ. Code, § 4600), our Supreme Court in *In re B. G., supra,* 11

---

[12]Civil Code section 232, subdivisions (a)(2) and (3) provide in pertinent part:

"(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:

". . . . . . . . . . . . . .

"(2) Who has been cruelly treated or neglected by either or both of his parents, *if such person has been a dependent child of the juvenile court, and* such parent or *parents deprived of his custody for the period of one year* prior to the filing of a petition praying that he be declared free from the custody and control of such cruel or neglectful parent or parents.

"(3) Whose parent or parents suffer a disability because of the habitual use of . . . any of . . . controlled substances . . . if such person *has been a dependent child of the juvenile court,* and the parent or parents *deprived of his custody because of such disability, . . . for the period of one year* continuously immediately prior to the filing of the petition praying that he be declared free from the custody and control of such parent or parents. As used in this subdivision, 'disability' means any physical or mental incapacity which renders the parent or parents unable to adequately care for and control the child." (Italics added.)

[13]Civil Code section 232.5 provides: "The provisions of this chapter shall be liberally construed to serve and protect the interests and welfare of the child."

Cal.3d 679, stressed the continued vitality of the parental preference doctrine. The *B. G.* court pointed out that "Civil Code section 4600 governs custody awards in juvenile court proceedings" (*id.,* at p. 683) thus providing a uniform rule applicable to the numerous "separate proceedings in which custody questions can be litigated." (*id.,* at p. 696.) The court concluded: "[S]ection 4600 permits the juvenile court to award custody to a nonparent against the claim of a parent only upon a clear showing that such award is essential to avert harm to the child. *A finding that such an award will promote the 'best interests' or the 'welfare' of the child will not suffice.*" (*Id.,* at pp. 698-699; italics added.) The court also stated that in passing the Family Law Act, "The Legislature did not . . . intend to disturb the judicial practice of awarding custody to nonparents in preference to parents only in unusual and extreme cases." (*Id.,* at p. 698.)

In addition, recent federal and state case law has stressed the constitutional dimensions of parental rights. "A judgment freeing a child from the custody and control of its parents results in the total severance of the natural ties between the parents and the child and amounts to the taking of 'a liberty' under the due process clause of the United States Constitution. (*Weinberger* v. *Wiesenfeld* (1975) 420 U.S. 636, 652 [43 L.Ed.2d 514, 527, 95 S.Ct. 1225, 1235]; *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208, 1212-1213]; *In re B. G., supra,* 11 Cal.3d 679, 688; *Lois R.* v. *Superior Court* (1971) 19 Cal.App.3d 895, 901 [97 Cal.Rptr. 158].)" (*In re Susan M.,* 53 Cal.App.3d 300, 310-311 [125 Cal.Rptr. 707].)[14]

As the court stated in *In re T.M.R.,* 41 Cal.App.3d 694, 703 [116 Cal.Rptr. 292]: "The relationship of a natural parent to her children is a vital human relationship which has far-reaching implications for the growth and development of the child. [Citations.] Thus the involuntary termination of that relationship by state action must be viewed as a drastic remedy which should be resorted to only in extreme cases of neglect or abandonment."

---

[14]We further note that a federal district court has declared that a parental termination statute requiring a mere preponderance of the evidence was an unconstitutional denial of due process under the Fourteenth Amendment. (*Alsager* v. *District Court of Polk Cty., Iowa* (S.D.Iowa 1975) 406 F.Supp. 10.) Based on the *Alsager* decision and *In re B. G., supra,* the court in *In re Robert P.,* 61 Cal.App.3d 310, 317-319 [132 Cal.Rptr. 5], has imposed a standard of proof of clear and convincing evidence in actions in custody proceedings pursuant to Civil Code section 4600 and Welfare and Institutions Code section 600. A fortiori, such a standard would apply to parental termination pursuant to Civil Code section 232.

In the case herein, there was no showing of an extreme case of abandonment; in fact, the record does not adequately support any claim of abandonment. Accordingly, we reverse the judgment with respect to Baby Girl G.

## *Disposition*

The judgment appealed from is reversed and remanded for further proceedings not inconsistent with the opinion expressed herein.

Allport, Acting P. J., and Cobey, J., concurred.