Filed 1/19/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re L.A.-O. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.A. et al., <br><br> Defendants and Appellants. | E077196 <br><br> (Super.Ct.Nos. J279705, J279706 and J285540) <br><br> ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT

The petition for rehearing filed on January 10, 2022 is DENIED.

The opinion filed in this matter on December 27, 2021 is MODIFIED as follows.

1.  On page 13, change this paragraph:

> In their reply briefs, both parents argue that the trial court erred by reasoning, at least in part, that they did not occupy a "parental role" whereas the prospective foster parents did. They assert that "[w]hile courts have traditionally required parents to . . . show[] . . . that they have acted in a parental role [citations] . . . this is no longer required in light of the Supreme Court's recent decision in *Caden C*."

to:

Both parents argue that the trial court erred by reasoning, at least in part, that they did not occupy a "parental role" whereas the prospective foster parents did. They assert that "[w]hile courts have traditionally required parents to . . . show[] . . . that they have acted in a parental role [citations] . . . this is no longer required in light of the Supreme Court's recent decision in *Caden C*." The father raised this issue somewhat obscurely — but adequately — in his opening brief. The mother joined in it and stated it more clearly in her reply brief.

2. Delete the next paragraph on page 13, beginning "The parents forfeited this argument . . . ."

Except for these modifications, the opinion remains unchanged. This modification does not effect a change in the judgment.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

We concur:

MILLER
J.

FIELDS
J.

2

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re L.A.-O. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.A. et al., <br><br> Defendants and Appellants. | E077196 <br><br> (Super.Ct.Nos. J279705, J279706 and J285540) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County. Annemarie G. Pace, Judge. Reversed and remanded with directions.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant M.A.

Jill S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant A.O.

Michelle D. Blakemore, County Counsel, and Kaleigh L. Ragon, Deputy County Counsel, for Plaintiff and Respondent.

M.A. (mother) and A.O. (father) appeal from an order terminating their parental rights to their three children. They contend that the juvenile court erred by finding that the parental-benefit exception did not apply. (See § 366.26, subd. (c)(1)(B)(i).)[1]

We publish this case to address two novel issues.

First, the parents contend that the Supreme Court's recent decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) overruled lower appellate court decisions holding that a parent asserting the parental-benefit exception must show that he or she occupies a "parental role." *Caden C.* did not use the words "parental role," and there are good reasons not to do so. The "parental role" requirement, though well-established, is not well-defined; it can be understood in ways that conflict with *Caden C.* and in ways that do not. Here, the trial court found that the parental-benefit exception did not apply partly because the parents "ha[d] not acted in a parental role in a long time" and partly because the prospective adoptive parents "ha[d] been acting in a parental role." Because it used this terminology, we cannot tell whether its ruling conformed with *Caden C.* Hence, we will remand for reconsideration of the parental-benefit exception.

Second, the parents contend that the juvenile court erred by "ignor[ing]" evidence in social worker's reports filed in connection with earlier hearings and that these reports established that the parental-benefit exception applied. We disagree. These reports were not introduced into evidence at the section 366.26 hearing; hence, neither we nor the

_____

[1] This and all further statutory citations are to the Welfare and Institutions Code, except as otherwise indicated.

juvenile court could consider them.  The parents will be free to introduce them on remand.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

At the beginning of 2019, the mother and the father had two children; their son N.A.-O. (N.) was five, and their daughter G. A.-O. (G.) was four.  The family was living in a trailer outside the maternal grandparents' house.

In January 2019, Children and Family Services (Agency) received a report that the home was filthy.  It then received a separate report that the maternal grandparents hit the children and the parents were methamphetamine addicts.  Both parents had prior arrests for possession of a controlled substance.

When social workers visited the home, the maternal grandparents were there, but the parents and children were not.  The maternal grandparents were "combative"; they denied knowing where the parents and children were.  The home was extremely filthy, unsafe, and "uninhabitable."

Accordingly, in February 2019, the Agency filed dependency petitions and obtained detention warrants.  When it tried to execute the warrants at the home, the maternal grandmother said the mother had left because "[s]he knew [the Agency] is looking for her."

In June 2019, a police officer on an unrelated call found the family at the home and detained the children. The trailer was still filthy. The children were "very dirty"; they had bruises, scratches, and head lice. G., at age four, was still wearing diapers.

In July 2019, at the jurisdictional/dispositional hearing, the juvenile court found that it had jurisdiction based on failure to protect. (§ 300, subd. (b).) It formally removed the children from the parents' custody and ordered reunification services.

Initially, the children were placed in a foster home in Fontana. Later in July 2019, however, they were placed in a foster home in Hemet, with a Mr. and Ms. B. In October 2019, they were placed with the mother's cousin in Victorville.

In May 2020, the parents had a third child — L.A.-O. (L.), a daughter. In June 2020, the Agency detained L. and filed a dependency petition as to her. In July 2020, at the jurisdictional/dispositional hearing as to L., the juvenile court found that it had jurisdiction based on failure to protect, failure to support, and abuse of a sibling. (§ 300, subds. (b), (g), (j).) It formally removed L. from the parents' custody and ordered reunification services.

In July 2020, the mother's cousin asked that N. and G. be removed. In August 2020, after a brief placement elsewhere, they were placed back with the B.'s. Meanwhile, also after a brief placement elsewhere, L., too, was placed with the B.'s.

Throughout the dependency, the parents continued to use methamphetamine (sometimes testing positive, sometimes failing to test).

In August 2020, at the 18-month review hearing as to N. and G., the juvenile court terminated reunification services; however, it did not set a section 366.26 hearing. Rather, it ordered that the children remain in foster care with a permanent plan of return home. It also ordered six months of discretionary services under the permanent plan.

In February 2021, the B.'s expressed interest in adopting all three children. Thus, the juvenile court terminated reunification services as to L. and set a section 366.26 hearing as to all three children.

In June 2021, at the section 366.26 hearing, the juvenile court found that the children were adoptable and that there was no applicable exception to termination of parental rights. It therefore terminated parental rights.

II

THE PARENTAL-BENEFIT EXCEPTION

A. *Additional Factual Background*.

The evidence at the section 366.26 hearing consisted of two social worker's reports, and the mother's oral testimony. That evidence showed the following.

The parents had supervised visitation once a week, for two hours at a time. Aside from a month or two, their visitation had always been supervised. They visited consistently. Usually, they were on time, though sometimes, they were five to ten minutes late.

At the beginning of the most recent reporting period, the visits were at a park, supervised by Ms. B. She reported that "the father was repeatedly going to the restroom,

appeared sleepy and sometimes nodding off, and was not being attentive to the children." During one video visit, both parents appeared to be under the influence, slurring their words.

G. told the social worker that the mother "said not to tell the worker anything, the social worker is a liar and that is why they are not going home." When the social worker told the mother that this was "inappropriate," she "was not receptive." The mother said she was not talking about the case but was just telling the children the truth.

As a result of these issues with visitation, visits were relocated to an Agency office and supervised by an Agency employee. As of the section 366.26 hearing, the social worker was recommending that visitation be reduced to once a month, for one hour at a time.

During recent visits, G. had tantrums. She cried, lay on the floor, and isolated herself in a corner. Ms. B. reported that, after visits, N. and G. argued more than usual on the way home. Once home, G. "had a difficult time adjusting"; she would scream, cry, and withdraw for an hour or more.

The mother testified that, at the beginning of visits, the children were happy; they would run to her and hug her. They called her mommy. During visits, the mother played with the children and fed them. She cared for L., feeding her and changing her diaper.

The mother conceded that G. would get "upset" at the beginning and end of visits. She explained that G. was upset because she knew "she has to go home and can't come

6

home with us." She testified that when G. was upset, she would come to the mother, who would comfort her. Sometimes N. or L. would also cry at the end of a visit.

The mother believed that termination of parental rights would be detrimental "[b]ecause my children know who we are. And we love them more than anything in the world." It would also separate them from their grandparents, aunts, uncles, and cousins.

The children had been placed with the B.'s for approximately 10 months, since August 2020. This was N. and G.'s fourth placement and L.'s second. The social worker reported that "[t]here appears to be a mutual positive attachment" between the children and the B.'s. They "appear comfortable in the home and with [Ms. B.,] whom they look to to meet their daily needs as their parental figure."

G. called the B.'s mommy and daddy. N. called them by their first names, preceded by "Mr." or "Ms." N. seemed "conflicted"; however, he said he wanted to stay with the B.'s, assuming he could not return to his parents.

B.     *Additional Procedural Background.*

The father did not testify at the section 366.26 hearing. His counsel, however, said: "Father would like to note that the social worker's report . . . is not correct. His visits have been going well. Father has visited consistently and he has not been under the influence as the . . . report indicates."

The juvenile court found that "the visits are regular but they are of poor quality." "[The parents] consistently visit the children. [¶] However, . . . there are issues with the visits.

"The children have been removed from the parents for a significant time and most of their visits have been supervised.

"They have not acted in a parental role in a long time.  And while it's obvious that they love their children very much and that this is mutual in a lot of respects, I believe that the permanency that adoption would provide in the home that has been acting in a parental role outweighs the detriment of the termination of parental rights."

C.    *Legal Background*.

"'[A]t a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child — adoption, guardianship or long-term foster care.' [Citation.]  At this stage of the dependency proceedings, adoption is preferred because it ensures permanency and stability for the minors.  [Citations.]" (*In re A.S.* (2018) 28 Cal.App.5th 131, 152.)  Thus, as a general rule, at a section 366.26 hearing, if the trial court finds that the child is adoptable, it must select adoption as the permanent plan and terminate parental rights.  (§ 366.26, subds. (b)(1) & (c)(1).)

However, there are several exceptions to this rule.  (§ 366.26, subds. (c)(1)(A)-(B), (c)(2).)  One such exception applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

The leading California Supreme Court case regarding the parental-benefit exception is *Caden C.*, *supra*, 11 Cal.5th 614.  Under *Caden C.*, to establish the parental-

benefit exception, a parent must prove three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631; see also *id.* at pp. 636-637.)

In "assess[ing] whether 'the child would benefit from continuing the relationship,' . . . the focus is the child. . . . [T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court must ask, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.]" (*Id.* at p. 633.)

"[A] substantial evidence standard of review applies to the first two elements." (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) But "the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Id.* at p. 640.) "A court abuses its discretion only when ""the trial court has

9

exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.'"'" [Citation.]" (*Id.* at p. 641.)

    D.    *The Parents' Contentions*.

        1.    *"Ignor[ing]" evidence in earlier reports*.

Both the mother and the father ask us to reverse based on evidence in earlier social worker's reports. These were not before the juvenile court when it ruled. The mother in particular complains that the juvenile court supposedly "ignored" the evidence in earlier reports.[2] But it could hardly ignore what it was never asked to consider.

"'[A]n appeal reviews the correctness of a judgment as of the time of its rendition, *upon a record of matters which were before the trial court for its consideration*.' [Citation.]" (*In re Zeth S.*, *supra*, 31 Cal.4th at p. 405, italics added.)

In preparation for a section 366.26 hearing, the social worker must prepare a report, which must address certain specified topics. (§§ 361.5, subd. (g)(1), 366.21, subd. (i), 366.22, subd. (b), 366.25, subd. (b)(1); Cal. Rules of Court, rule 5.725(c).) At the hearing, the juvenile court "shall review th[is] report" and "shall receive other evidence that the parties may present . . . ." (§ 366.26, subd. (b).) The juvenile court "must state on the record that the court has read and considered the report . . . and any other evidence . . . ." (Cal. Rules of Court, rule 5.725(d); see also § 366.26, subd. (b).) By negative

_____

    **2**    In fairness, we note that the Agency also discusses information in earlier reports.

implication, the juvenile court cannot consider any evidence unless it "receive[s]" it from a party and "state[s] on the record" that it has considered it.

At oral argument, the father's counsel argued that the "strict" rules of evidence do not apply in dependency hearings, citing section 355. That section merely provides that a social worker's report is admissible, even though it is hearsay. (§ 355, subds. (b), (c); see also § 281; see generally *In re Malinda S.* (1990) 51 Cal.3d 368, 375-382.) Otherwise, it does not affect the applicability of the Evidence Code. It also provides, at least with respect to a jurisdictional hearing, that "[a]ny legally admissible evidence that is relevant . . . may be received in evidence." (§ 355, subd. (a).) Implicitly, then, evidence must be "received in evidence" to be considered.

Accordingly, at the beginning of a dependency hearing, counsel for the social services agency typically offers specified reports into evidence and the juvenile court typically admits them. The juvenile court then asks the parties if they have any other evidence, and if so, it admits that, too. The repetition of this ritual may numb the participants to its significance, but it is no mere formality. It allows everyone concerned — including this court — to focus on a shared body of facts.

If the juvenile court were to base its decision, without any warning, on a fact that it just happened to remember from a report filed years earlier, no doubt the parties would cry foul. (See *In re George G.* (1977) 68 Cal.App.3d 146, 156-159 [failure to provide parents with a copy of social worker's report violates due process].) By the same token,

we cannot reverse an order simply because some fact unearthed from some report filed months or years earlier might tend to undercut it.

On this record — i.e., without considering the earlier reports — we cannot say that the parental-benefit exception applied as a matter of law.

As to the father, there was no evidence of a beneficial relationship at all. During park visits, he kept going to the restroom, he seemed sleepy, and he was not attentive to the children. During one video visit, he appeared to be under the influence. There was no other evidence regarding his visits.

As to both parents, there was evidence that the visits actually upset the children. G. had tantrums during the visits. The mother claimed that G. would come to her for comfort and she was able to calm G. down; the social worker, however, reported that G. would "isolate[e] herself in a corner" and was "difficult" to "redirect[]." When G. got home, she remained inconsolable, screaming, crying, and withdrawing for an hour or more. The mother claimed that G. was upset because she could not go home with her. She did not testify to any facts supporting her lay opinion. In any event, even assuming she was correct, if the juvenile court did not terminate parental rights, G. still would not be able to go home with the mother. Instead, she would be denied permanency and doomed to keep going to visits that were evidently more traumatic than beneficial

And G. was not the only one who was upset. Sometimes, N. and L. also cried at the end of visits. On the way home, N. and G. would argue more than usual. Admittedly,

12

N. seemed "conflicted" — torn between the parents and the B.'s. The trial court, however, could view this as evidence that he would benefit from permanency.

2. *Requiring parents to occupy a "parental role."*

In their reply briefs, both parents argue that the trial court erred by reasoning, at least in part, that they did not occupy a "parental role" whereas the prospective foster parents did. They assert that "[w]hile courts have traditionally required parents to . . . show[] . . . that they have acted in a parental role [citations] . . . this is no longer required in light of the Supreme Court's recent decision in *Caden C.*"

The parents forfeited this argument by failing to raise it in their opening briefs. (*In re J.N.* (2006) 138 Cal.App.4th 450, 459, fn. 5.) Nevertheless, we have discretion to excuse a forfeiture when, as here, the issue presents a pure question of law. (*In re S.S.* (2020) 55 Cal.App.5th 355, 370, fn. 3; *People v. Oneal* (2021) 64 Cal.App.5th 581, 590; see generally *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

The source of a parental-role requirement is *In re Beatrice M.* (1994) 29 Cal.App.4th 1411. There, the court said, "We do not agree that frequent and loving contact . . . is sufficient to establish the 'benefit from a continuing relationship' contemplated by the statute. No matter how loving and frequent their contact with the girls, appellants had not occupied a parental role in relation to them at any time during their lives. 'Interaction between [a] natural parent and child will always confer some incidental benefit to the child. . . . The exception applies only where the court finds

13

regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent.' [Citation.]" (*Id*. at pp. 1418-1419.)

As subsequent courts paraphrased this, "[t]he parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. [Citations.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 954.) They have characterized a "parental role" as something "more than frequent and loving contact, an emotional bond with the child, or pleasant visits. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229; accord, *In re A.G.* (2020) 58 Cal.App.5th 973, 995.) They have contrasted a parental role with that of a "friendly visitor." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468; *In re Jason E.* (1997) 53 Cal.App.4th 1540, 1548.)

"Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51, disapproved in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5) The parental role requirement also does not demand that "the child ha[ve] a 'primary attachment' to the parent. [Citation.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 299.)

*Caden C.* did not use the words "parental role" in its analysis.[3] In fact, our Supreme Court has never formulated the parental-benefit exception in terms of a "parental role."

---

**3** It did use them once, but only when quoting the trial court. (*Caden C.*, *supra*, 11 Cal.5th at p. 628.)

14

*Caden C.* cautioned that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern. [Citations.] Certainly, it is not necessary — even if it were possible — to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits.' [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

*Caden C.* also held that, in applying the parental-benefit exception, "the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s) . . . [C]ourts should not look to whether the parent can provide a home for the child . . . . [Citation.] Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at p. 634; see also *id.* at p. 638.)

In addition, "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) "[T]he parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)

Unfortunately, the words "parental role," standing alone, can have several different meanings. They can mean being the person whom the child regards as his or her parent (or at least as more his or her parent than any other caregiver). However, we

15

already know that the parental-benefit exception does not require that the parent be the child's primary attachment.

They can mean being a *good* parent — nurturing, supportive, and guiding. *Caden C.*, however, tells us that the parental-benefit exception does not require being a good parent; it does not require that the parent have overcome the struggles that led to the dependency, and it does not require that the parent be capable of resuming custody.

These words can also mean giving parental care, such as changing diapers, providing toys and food, and helping with homework. This would conflict, however, with *Caden C.*'s warning that "rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

In the case law, a "parental role" is defined largely in terms of what it is not. It is not merely frequent and loving contact; it is not merely pleasant visits; it is not being merely a friendly visitor; and it is not merely an emotional bond (as opposed to a significant, positive, emotional attachment). This list of "nots" is consistent with *Caden C.* However, it tells us nothing about the mysterious X factor that will boost the parent up from being merely a friendly visitor and into the requisite parental role.

All we really know about this X factor is that it must result in "a substantial, positive, emotional attachment." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) As the mother's counsel said at oral argument, a parental role "goes hand-in-hand" with a substantial, positive, emotional attachment. For this reason — and because "parental role," standing alone, is ambiguous — we think it is better not to use the words "parental

16

role" at all. After all, *Caden C.* managed to describe and discuss the parental-benefit exception without using them.

Our position is consistent with *In re D.M.* (2021) 71 Cal.App.5th 261. It held that the trial court erred by equating a "parental role" with "attendance at [the children's] medical appointments, and understanding their medical needs . . . ." (*Id*. at p. 270) "Instead, the focus is whether there is a substantial, positive emotional attachment between the parent and child." (*Ibid*.)

It is also consistent with *In re J.D.* (2021) 69 Cal.App.5th 594. There, the trial court found that the mother did not have a "parental bond" with the child. (*Id*. at p. 619.) The appellate court said, "*Caden C.* did not address whether, to satisfy the second element, the nature of a parent's relationship must be 'parental,' a descriptor the Supreme Court did not use and that, standing alone, is vague and unhelpful in this context. *Caden C.* said only that the child must have a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.' [Citations.]" (*Id*. at p. 624.) "Here, then, we cannot be sure whether the juvenile court's determination that mother did not occupy a 'parental' role encompassed factors that *Caden C.* deems irrelevant. [Citation.]" (*Id*. at p. 625) The court therefore "remand[ed] . . . for a new section 366.26 hearing in light of the legal standards articulated in *Caden C.*" (*Id*. at p. 601.)

Here, the trial court's ruling was terse. It explained that the parents "ha[d] not acted in a parental role in a long time" and the prospective adoptive parents "ha[d] been

17

acting in a parental role."  It may have meant that the children had a substantial, positive, emotional attachment to the prospective adoptive parents but not to the parents.  That would be legally correct.  However, from its reference to a long time, it seems to have meant that that were not capable of taking custody, or had not been good parents, or had not been providing necessary parental care.  That would be erroneous.

Hence, like the court in *In re J.D.*, *supra*, we will remand with directions to reconsider the application of the parental-benefit exception.

### III

### DISPOSITION

The orders appealed from are reversed.  On remand, the juvenile court must reconsider the application of the parental-benefit exception in light of *Caden C.* and this opinion.

CERTIFIED FOR PUBLICATION

RAMIREZ _____
P. J.


We concur:

MILLER _____
J.

FIELDS _____
J.

18