[Civ. Nos. 35534, 35535. Second Dist., Div. Five. Jan. 18, 1971.]

Adoption of ANDREA LYNN OUKES et al., Minors.
LARRY LEE MOORE et al., Plaintiffs and Respondents, v.
DONNA LEE McGARY OUKES, Objector and Appellant.

COUNSEL

Jerome L. Levine and David A. Binder for Objector and Appellant.

Frank A. Hillsinger for Plaintiffs and Respondents.

OPINION

AISO, J.—On May 16, 1968, petitioners Larry Lee Moore and Kay Jewel Moore (husband and wife) filed a petition for the adoption of the twins, Andrea and Andrew Oukes, born on March 18, 1966, to appellant Donna Lee McGary Oukes and Jan Oukes, her husband. Kay Moore is Jan's sister and paternal aunt of the infants. Jan signed a formal consent to adoption of the twins by the petitioners on August 14, 1968. He had orally agreed to the adoption prior to petitioners' instituting the adoption proceedings. Appellant refused to consent.

Petitioners then, on December 5, 1968, filed their petition to have the infants declared free from the custody and control of their natural parents. (Civ. Code, § 232, subd. (a).)[1] A judgment declaring the minors free from

[1]The pertinent portion of Civil Code section 232 reads:
"An action may be brought for the purpose of having any person under the age of 21 years declared free from the custody and control of either or both of his parents when such person comes within any of the following descriptions:
"(a) Who has been left by both of his parents or his sole parent in the care and custody of another without any provision for his support, or without communication from such parent or parents, for the period of six months with the intent on the part

the custody and control of the natural parents (2d Civ. No. 35535) and a decree granting the petition for adoption of the minor children (2d Civ. No. 35534) were both granted and entered April 24, 1969. The appeal is from both the judgment and decree. However, appellant has directed her contentions of error only against the judgment declaring the infants to have been abandoned.

Appellant contends: (1) The finding that she abandoned the minors is not supported by the evidence. (2) A finding that one parent has consented to an adoption of the minors is not tantamount to a finding of abandonment on that parent's part and consequently there was no compliance with Civil Code section 232, subdivision (a), which appellant contends requires a finding of abandonment by both parents where they are both living and there is no judicial decree altering their natural rights to joint custody.

## I.

The attack on the sufficiency of the evidence calls for a recital of the facts which, however, are stated in the light most favorable to respondents. (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 143 [134 P. 1157]; *Boyle* v. *Hawkins* (1969) 71 Cal.2d 229, 233, fn. 4 [78 Cal.Rptr. 161, 455 P.2d 97].)

Jan and appellant were married on May 18, 1957, when they were, respectively, only 17 and 16 years of age. Marital differences between them commenced in 1966. Appellant was hospitalized for a short time in the fall of that year. The couple ceased living together in April 1967. During the ten-year span, they had procreated seven children. One had died. Six were living. Besides Andrea and Andrew, there were: Jan, Junior, 10 years old; Denise, 7 years old; Richard, 6 years old; and Barry, 3 years old.

When appellant was again hospitalized in November 1967, Jan moved back into the family home in order to look after the six children. He also brought along a Miss Charlene Ferguson (age 22 at time of trial), who had been helping him to keep the books and records of his landscaping business, to assist him in caring for the children. Jan informed appellant of this fact. According to her, this caused her to feel depressed and com-

---

of such parent or parents to abandon such person. Such failure to provide, or such failure to communicate for the period of six months, shall be presumptive evidence of the intent to abandon. Such person shall be deemed and called a person abandoned by the parent or parents abandoning him. If in the opinion of the court the evidence indicates that such parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by such parent or parents."

pletely hopeless. She returned home from the hospital after a 10-day stay, having been told that she should seek psychiatric care at the state hospital.

Appellant and Jan executed a written separation agreement, dated December 26, 1967, which was recorded the same date in the office of the County Clerk of Monroe County, New York.[2] Jan's attorney prepared the document. Appellant did not have independent legal advice. The agreement provided, among other things, that the parties could live separate and apart as if they were unmarried persons and that appellant have custody of all six children.

In February 1968 appellant went to live with her sister, Darlene, in Blasdell (suburb of Buffalo), New York, in order to "rest and try to get hold of [herself]." She took one child, Barry, with her but left the other five children in Rochester with Jan who assumed physical custody of them.

Shortly thereafter Jan contacted appellant to have her inquire of her cousin (who had taken care of Andrea and Andrew during her 1966 hospitalization) whether the cousin and her husband would adopt the twins. They indicated a willingness to take care of the twins, but not to adopt them. Jan then telephoned his sister, the petitioner Kay Moore, living in Gardena, California, and inquired whether she and her husband would take care of Andrea and Andrew. After consultation with her husband (petitioner Larry Moore), Kay Moore telephoned Jan advising him that she would do so upon a trial basis not to exceed six months. There was no discussion of any adoption at this time. She told Jan that she would need a custody agreement for use in the event of an emergency, such as hospitalization of the infants in event of serious illness.

Jan had his lawyer prepare a custody agreement and took it to appellant

---

[2]Jan intended this transaction to be the foundation for a divorce action upon the lapse of two years. We take judicial notice (Evid. Code, § § 452, subd. (a) and 459) of the New York Domestic Relations Law section 170, which provided in part: "An action for divorce may be maintained by husband or wife to procure a judgment divorcing the parties and dissolving the marriage on any of the following grounds: . . . (6) The husband and wife have lived separate and apart pursuant to a written agreement of separation, subscribed and acknowledged by the parties thereto in the form required to entitle a deed to be recorded, for a period of two years after the execution of such agreement and satisfactory proof has been submitted by the plaintiff that he or she has substantially performed all the terms and conditions of such agreement. Such agreement shall be filed in the office of the clerk of the county wherein either party resides by either party to such agreement, prior to the commencement of an action as authorized herein. In lieu of filing such agreement, either party to such agreement may file a memorandum of such agreement, which memorandum shall be similarly subscribed and acknowledged as was the agreement of separation and shall contain the following information: (a) the names and addresses of each of the parties, (b) the date of marriage of the parties, (c) the date of the agreement of separation and (d) the date of the subscription and acknowledgment of such agreement of separation."

in Buffalo (Blasdell). They executed the agreement before a notary public in Buffalo on February 20, 1968.[3] It modified the custody provisions set forth in the December 26, 1967, separation agreement. Among the provisions relevant to the issues before us were the following: it acknowledged that the parties had lived separate and apart since January 1, 1967; that the parties thereto felt unable to properly care for Andrea and Andrew;[4] that Kay Moore and her husband, Larry Moore, residing in Gardena were fit, competent, and capable persons to provide a good home for and to give full time to the care, maintenance, and education of the twins; that the Moores were financially able and in a better position to properly care for and educate the infants; that the Moores were willing to accept custody and to treat the infants "as if they were their own natural born children"; that appellant agreed with Jan that the best interests of the infants required that "Mrs. Larry (Kay) Moore be given absolute custody of the said infant children . . . during their minority"; that appellant "consents and relinquishes all claims to custody of said children"; and that Jan could "take the children to California, to their aunt, Kay Moore and Larry Moore, to live with them."

Appellant was not represented by legal counsel when she signed the custody agreement. She claimed at trial that she signed it because Jan told her that the only other alternative was to put the twins in a foster home. The record is silent as to whether the Oukes could have financially afforded such care.

Following the execution of the custody agreement, Jan took Andrea and Andrew by air to California on February 23, 1968, and placed them in the custody of petitioners in which they have been ever since. Jan left $200 with the Moores to replenish the children's clothing, furniture, and playthings which air travel did not permit bringing along; he did not intend the sum as any advance or part payment on account of support. The Moores have not asked Jan to pay nor has he paid anything to them for the children's support. Jan informed appellant of his delivery of the twins to the Moores.

After sojourning three weeks in Blasdell, appellant returned to Rochester where she lived with her mother, whose home was just two doors from that where the other children were living. On March 9, 1968, she and Jan executed another agreement (recorded in Monroe County, New York, on March 20, 1968), which transferred "absolute" custody of Jan, Junior,

---

[3]It was not recorded until March 4, 1969, in the clerk's office, Monroe County, New York.

[4]Appellant also admitted at the trial that in February 1968 she was emotionally upset and unable to care for the children and so informed her husband.

Denise, and Richard from appellant to Jan. Appellant retained Barry's custody. His physical custody was later turned over to Jan in June, August or September of 1968.[5]

On March 29 or 30, 1968, appellant moved to Pennsylvania where she stayed with her cousin, Mrs. John McConnell. She again returned to her mother's home in Rochester in August of 1968. In October of 1968, she moved to Texas, and lived with Mr. and Mrs. Hood of Waco, Texas, from November 1968 to the date of trial on March 11, 1969.

During this period from February 1968 to March 11, 1969, appellant communicated with petitioners only three times, and with Andrew possibly once. The first time was in July of 1968, when she was advised to make an appointment with a social worker in Butler, Pennsylvania, for the purpose of signing her consent to the adoption of the twins by petitioners. There is a conflict between appellant's testimony and that of Kay Moore as to whether appellant spoke to Andrew on this occasion when she called the Moores by telephone. The second communication was also by telephone and upon receipt of notice of the abandonment proceedings. The third was in the form of a personal appearance at the Moore home a week or so after the second phone call, when she attempted to physically remove Andrea and Andrew from the Moore home.

In marked contrast to her sending Christmas and birthday cards and presents to the children she had left in Rochester with Jan, appellant by her own admission never sent any greeting cards or presents to Andrea and Andrew, nor did she inquire of the Moores as to their welfare. She never sent any support money, although in justice to her we note that the record reflects that she did not have the financial ability to do so. She never kept the Moores advised of her peregrinations away from Rochester. She seeks to excuse her failure to communicate on the ground that she was too emotionally upset and grief stricken over the sad state of her family life. She asserts that she signed the custody agreement reluctantly and never intended to abandon the twins or to consent to their adoption by others.

In the meantime, petitioners became enamoured with Andrea and Andrew after having them in their home for about four to six weeks, and commenced discussions with Jan by telephone concerning their adoption of the twins. Jan did not agree immediately, but agreed after a series of

---

[5]Jan claimed that it took place in June; appellant claimed that it was in August or September.

telephone conversations. He did apprise petitioners that appellant would probably say, "No." Having obtained Jan's oral consent, petitioners filed their petition for adoption of the twins on May 16, 1968.

## II.

■ Returning to appellant's contention that the evidence does not support the trial court's finding that she had abandoned Andrea and Andrew within the meaning of Civil Code section 232, we find it to lack merit. That between February 1968 and March 11, 1969, appellant communicated with petitioners on only three occasions is not in dispute. The statute provides that "failure to provide, or . . . failure to communicate for the period of six months, shall be presumptive evidence of the intent to abandon. . . . If in the opinion of the court the evidence indicates that such parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by such parent or parents." (Civ. Code, § 232.) We interpret the second sentence as meaning that a court finding that the efforts are token only, leaves the presumption intact.

■ The questions of abandonment and of intent under the code section cited, including the issue of whether the statutory presumption has been overcome satisfactorily, are questions of fact for the resolution of the trial court. (*Adoption of Morrow* (1970) 9 Cal.App.3d 39, 46-47, 52 [88 Cal.Rptr. 142]; *In re Conrich* (1963) 221 Cal.App.2d 662, 668 [34 Cal. Rptr. 658]; *In re Gano* (1958) 160 Cal.App.2d 700, 705, 706 [325 P.2d 485]; *In re Sanders* (1948) 88 Cal.App.2d 251, 254 [198 P.2d 523].) ■ In determining whether the evidence is sufficient to support a finding of abandonment, "[a]ll evidence most favorable to respondents must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact." (*In re Gano, supra,* at p. 705.) Where there is substantial evidence supportive of the finding, the appellate court may not disturb the finding.

■ Despite the knowledge gained in July 1968 that an adoption proceeding was in progress, appellant took no affirmative steps to communicate on her own initiative following her phone call to the Moores after she was requested to make an appointment with the social worker in Pennsylvania to sign her consent to the adoption. Consequently, appellant's July 1968 telehone call could have been found to be a token one which did not interrupt the running of the statutory period or interfere with the statutory presumption. The trial court also could have found that the only time appellant manifested any interest in the welfare of the infants during the span of over a year (February 1968 to March 1969) was when she was

threatened by legal action (*Adoption of Morrow* (1970) *supra*, at p. 54), and that the three communications during that span of over one year therefore constituted only token communications.

Appellant's assertion that she entertained no intent to abandon is not decisive. It is but one of the facts and circumstances to be taken into consideration. (*In re Bisenius* (1959) 173 Cal.App.2d 518, 522 [343 P.2d 319].) The agreement wherein appellant consented to the relinquishment of all claims to custody and transferring "absolute" custody for the entire period of minority of the infants may not have the same force as a judicial order adjudicating an abandonment, but it is indicative of a state of mind evincing an intent to abandon. (*In re Sanders* (1948) *supra*, 88 Cal. App.2d 251, 255; cf. *In re Gano* (1958) *supra*, 160 Cal.App.2d 700, 706.) While appellant did sign the various agreements without benefit of legal advice and, according to her, under pressure, she does not explain why she did not seek legal advice earlier than she did or why she made no attempt to rescind her agreements. She testified that she noted that the custody agreement omitted any provision for the infants' support by the Oukes, which reflects mental alertness despite claims of emotional upset.

The claim that appellant was prevented from communicating by emotional and mental strain engendered from her marital difficulties, even if believed, does not in and of itself constitute a legal excuse for her failure to keep in touch with the infants directly or through the Moores. (*Adoption of Morrow* (1970) *supra*, 9 Cal.App.3d 39, 53; *In re Maxwell* (1953) 117 Cal.App.2d 156, 166 [225 P.2d 87].) Appellant does not explain why she continued to communicate with the children in Rochester, but not with Andrea and Andrew in California, or at least inquire of the Moores about the welfare of the twins. Appellant was able to travel from place to place and to look after herself.

The issue of credibility is for the trier of fact to determine. Considering the totality of the circumstances and the conflicts in evidence reflected by the record, we are unable to state that the trial court was not justified in finding as it did. (*In re Conrich* (1963) *supra*, 221 Cal.App.2d 662, 668.)

██ Financial inability may excuse the failure to send any funds for support of the children (*In re Cattalini* (1946) 72 Cal.App.2d 662, 667 [165 P.2d 250]), but the failure to communicate for the requisite statutory period of time is adequate ground under the statute to adjudicate an abandonment by the non-communicating parent.

### III.

██ Citing *In re Edwards* (1930) 208 Cal. 725 [284 P. 916], appellant

contends that the trial court did not comply with Civil Code section 232. More specifically she claims that where both parents are alive and neither has been judicially deprived of the right to custody, the court must find both parents guilty of abandonment, and that a finding of abandonment by one parent and a consent to an adoption by the other parent does not meet the section 232 requirements. Although the argument is ingenious, we do not agree.

The instant case falls neither within the facts nor the rationale of *Edwards*, which was primarily a pleading issue under a predecessor statute, Juvenile Court Law, section 15. The petition alleged only that the father had abandoned the child then in custody of the petitioner, that the father had failed to provide support, and that the whereabouts of the mother were unknown. The record reflected that the mother in the meantime had been actively trying to regain custody of the child.

The court stated on pages 735-736: "[W]hen the minor has both parents, each of these parents must either join in the acts of abandonment or the parent not joining therein must be shown either to have given said minor in the custody of the one committing said acts, or in some other manner to have expressly or impliedly consented to said acts, before the court could take from them, *or at least from the innocent parent,* the custody of said child. Otherwise a father might surreptitiously take from the mother their minor child and leave him in some remote locality where the mother has no means of knowing and does not know of his whereabouts. Yet if such child is left by the father in the care of another under the conditions enumerated in section 15, said child becomes an abandoned child and the mother, *without any fault on her part,* has forever lost the control and custody of her own child." (Italics added.) Here appellant agreed to turning custody of the twins over to petitioners and made no effort to discharge her duties as natural parent until threatened by legal action. The physical whereabouts of the infants was at no time concealed from her. Furthermore, the court in finding abandonment on her part adjudicated that she was not an innocent parent.

The innocent parent, if there be one, on the abandonment issue in this case, was Jan. But Jan executed a formal consent to the adoption of the minors. We can think of no more unequivocal act surrendering control and custody of a child than consenting to its adoption by others. The consenting parent thereby gives up all rights he has as a natural parent and severs all legal relationships of parent and child with the infant being adopted. In many cases, no doubt it means untold emotional sacrifice on the parent's part which is sublimated in favor of rational concern for the best interests of the child's welfare. We construe the finding of a formal consent to

adoption by the father in this case to be tantamount to a finding of an abandonment for the purposes of the statute under scrutiny. Hence, even assuming appellant's construction of the holding in *Edwards* to be applicable to this case, there was a compliance with the requirements of Civil Code section 232, subdivision (a).

Both appellant and Jan acknowledged their inability to properly care and provide for the minors involved. The Legislature has enjoined in Civil Code section 232.5 that "[t]he provisions of this chapter shall be liberally construed to serve and protect the interests and welfare of the child." The purpose of this statute was to change "the rigidity of existing custody rules preferential to the natural parents over third parties" which stressed "a proprietary or property interest in children" and did not assure the "best interests of the children." (*In re Neal* (1968) 265 Cal.App.2d 482, 489-490 [71 Cal.Rptr. 300]; *Adoption of Morrow* (1970) *supra,* 9 Cal.App.3d 39, 57.)

## IV.

The judgment (2d Civ. No. 35535) and the decree (2d Civ. No. 35534) are both affirmed; each side to bear its own costs on appeal.

Kaus, P. J., and Reppy, J., concurred.