Filed 5/20/15  Adoption of J.M. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Adoption of J.M., a Minor. | |
| JOSE M.,   Plaintiff and Respondent, v. SERGIO M.,   Defendant and Appellant. | A142582 (San Mateo County Super. Ct. No. A15894) |

Sergio M. appeals from a judgment terminating his parental rights to his daughter J.M. (the minor) on the basis of abandonment under Family Code section 7822.[1]  He contends the evidence does not support a finding he left the minor in the custody of her mother, Jessica M., with the intent to abandon her.  We affirm.

## I.  FACTS AND PROCEDURAL HISTORY

Sergio and Jessica were married in 2007 and lived in the San Bernardino area, where their families also lived.  Jessica gave birth to the minor that same year.  In August of 2008, when the minor was 10 months old, the couple had an argument in which Sergio pushed Jessica and hit her in the face while she was carrying the minor.  Sergio was arrested and placed on probation after being convicted of inflicting corporal injury on a

---

[1]  Further statutory references are to the Family Code unless otherwise indicated.

spouse or cohabitant under Penal Code section 273.5, subdivision (a). Jessica obtained restraining orders against him.[2]

Between August 2008 and February 2009, Sergio visited the minor about once a month under Jessica's supervision. During this period, Sergio gave the minor toys, clothing and diapers and provided Jessica with a total of about $1,000, which she used to pay off the couple's debts. Sergio last saw the minor in February 2009, and in April 2009 his probation was revoked and he was sentenced to a year in jail in the domestic violence case. He did not send the minor money, cards or gifts while he was in custody, and Jessica did not take the minor to visit him because she did not want the minor exposed to jail. Sergio's mother visited the minor after Sergio went to jail.

Jessica filed for divorce while Sergio was in custody. On November 4, 2009, the family court entered a default judgment of dissolution in which Jessica was awarded primary custody of the minor and Sergio was denied visitation "until both parties attend Family Court Services at a later date due to Respondent being incarcerated." Sergio was ordered to pay Jessica $644 per month in child support and to pay for half of all unreimbursed medical, dental and orthodontia bills.

Sergio was released from custody in January 2010. He did not contact Jessica and did not pay her any child support. Jessica made no effort to contact Sergio or collect the support owed.

Jessica began dating Jose M. and moved to San Mateo County with him in 2010.[3] They married in April 2010, and had a child together in 2012. Jose became like a father to the minor, and Jessica described their relationship the following way: "She was a year

_____

[2] Sergio's opposition to the petition to terminate his parental rights includes as exhibits copies of temporary restraining orders effective during the first part of 2009, but the record does not contain copies of any permanent domestic violence restraining order that may have ultimately issued. Jessica told a counselor from Family Court Services that a criminal restraining order was in effect until April 2013, but that order is not included in the record.

[3] At the time of the hearing in this case, the family had moved back to the San Bernardino area.

and a half when she first met him. And ever since, it's just—I mean, he's been to every single doctor's appointment. She's with—do all of her activities, after-school activities together. She just sees him as a dad. She's always asking where—what he—what he's doing, because she wants to go with him. You know, likes it when he picks her up from school. I mean, they just—they have a very good relationship. [The minor] sees him as a father."

On September 23, 2011, Jose filed an adoption request (Form ADOPT-200) in the superior court, seeking to adopt the minor. He called Sergio on the telephone to ask for his consent to the adoption, but Sergio said he would not sign any papers giving up his parental rights to the minor. On May 12, 2012, Jose filed a petition to terminate Sergio's parental rights on the ground that Sergio had failed to have contact with or pay support for the minor since 2008. On December 12, 2013, Jose filed an amended petition to terminate Sergio's parental rights, accompanied by the declaration of a registered process server outlining his unsuccessful efforts to locate Sergio and serve him with the petition.

Sergio eventually received notice of the proceedings and, along with Jessica, Jose and the minor, was interviewed by a counselor with the San Mateo County Family Court Services in connection with a report prepared pursuant to section 7851. The counselor recommended that Sergio's rights be terminated: "Information available for this report appears to indicate that the father has not had contact with the minor for approximately five years. The petitioner, mother, and minor all gave the impression that the minor and the petitioner have a bonded relationship with one another. For all of these reasons, this counselor is recommending that it is in the best interest of the minor that she be declared free from the custody and control of the father for the purpose of adoption."

A contested hearing was held on the petition to terminate Sergio's parental rights on May 1, 2014.

Jessica testified that she and Jose had decided to pursue an adoption because the minor viewed Jose as her father and wanted to share his last name. Jessica had not made active efforts to enforce the child support order against Sergio because she and Jose were both working and supporting the minor. She did not believe it was in the minor's best

3

interests to see Sergio because of his violent nature and she had not made efforts to provide him with her contact information or arrange a family court mediation so he could see the minor. However, Jessica thought Sergio could have found her through her family members if he had wanted to. She had not received any messages from Sergio through Facebook, but her husband Jose called him after her brother Alberto provided her with his phone number.

Jose testified that he was very close to the minor and wanted to adopt her. He called Sergio in 2011 to tell him about the proposed adoption and Sergio said he would not sign any papers. Jose did not demand money from Sergio, but told him he should stand up to his duties as a father if he really wanted to see the minor. Sergio did not say he wanted to see the minor and did not ask for Jose's address.

Sergio testified that his mother visited Jessica and the minor while he was in jail, and he provided money from his savings account for his mother to give to Jessica. After his release from jail, he contacted the family court to see about paying support but discovered that Jessica had not set up an account for that purpose and he was unable to do so because he did not have her Social Security number. He tried to set up a court mediation so he could get visits with the minor under the terms of the judgment in the divorce action, but he could not do so because he did not have Jessica's current contact information. Sergio had run into Jessica's brother Alberto more than once and had asked for Jessica's contact information, but Alberto would not provide it.[4] Sergio acknowledged that Jose called him in 2011 to discuss the adoption proceeding, at which time Jose told him that if he wanted to see the minor, he would have to pay $60,000. Sergio sent Jessica two messages through Facebook, but she didn't respond.

Sergio's mother indicated she brought presents and money when she visited the minor. She last saw the minor in January 2010, after which she received a phone call from Jessica telling her she did not want the visits to continue. Jessica testified she did

_____

[4]  Alberto testified that he had seen Sergio twice since 2009 and had refused to provide Jessica's telephone number, though he took Sergio's contact information and provided it to Jessica in 2011.

4

not tell the paternal grandmother not to visit, but did say that if she was not going to receive any child support from Sergio, she wanted to get on with her life. She then moved to San Mateo.

After hearing this testimony and considering the report under section 7851, the trial court granted the petition to terminate Sergio's parental rights, finding by clear and convincing evidence that abandonment had been established under section 7822, subdivision (a). The court noted that although there had been a restraining order in effect for several years, Sergio had made only token efforts to support or communicate with the child during that time.

## II. DISCUSSION

Sergio argues the judgment terminating his parental rights must be reversed because no substantial evidence supports the trial court's implicit determination he "left" the minor in Jessica's care or possessed the requisite intent to abandon. We disagree.

### A. *General Principles and Standard of Review*

Section 7800 et seq. governs proceedings to have a child declared free from a parent's custody and control. The purpose of these types of proceedings is to promote the child's best interests "by providing the stability and security of an adoptive home." (§ 7800.) The statutes are to "be liberally construed to serve and protect the interests and welfare of the child." (§ 7801.)

Under section 7822, a court may declare a child free from a parent's custody and control if the parent has abandoned the child. Abandonment occurs when a "parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).)

"[A] section 7822 proceeding is appropriate where 'three main elements' are met: '(1) the child must have been left with another; (2) without provision for support or without communication from . . . his parent[] for a period of one year; and (3) all of such acts are subject to the qualification that they must have been done "with the intent on the

5

part of such parent . . . to abandon [the child]." ' [Citation.]" (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010 (*Allison C.*).) These elements must be proved by clear and convincing evidence. (§ 7821.)

On appeal, we apply the substantial evidence standard to review the trial court's findings, both express and implied, under section 7822. (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1010; *In re Rose G.* (1976) 57 Cal.App.3d 406, 425 (*Rose G.*).)[5] Under this standard, all conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged to uphold the judgment. (*Allison C.*, at pp. 1010-1011.) Abandonment and the intent to abandon are questions of fact for the trial court, whose decision binds the reviewing court so long as it is supported by substantial evidence. (*Id.* at p. 1011.) A parent challenging an order terminating his or her rights bears the burden of showing the finding is not supported by substantial evidence. (*Ibid.*) Although the trial court's findings must be based on clear and convincing evidence, "this standard of proof ' "is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard." ' " (*Id.* at p. 1010.)

B. *The Finding Sergio "Left" the Minor with Jessica*

Sergio contends the first element of abandonment under section 7822 was not established because no substantial evidence supports the conclusion he "left" the minor with Jessica for the requisite one-year period. He notes that a restraining order required him to stay away from Jessica, and observes that the judgment in the divorce case granted Jessica sole physical custody and denied him any visitation pending the couple's participation in court mediation. We are not persuaded.

In determining the threshold issue of whether a minor has been "left" under section 7822, the focus of the law is "on the voluntary nature of a parent's abandonment

---

[5] The decision in *Rose G.* construes former Civil Code section 232, the predecessor statute to section 7822, as do other pre-1994 cases in this opinion.

6

of the parental role rather than on *physical* desertion by the parent." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 69 (*Amy A.*).) "[A] parent will not be found to have voluntarily left a child in the care and custody of another where the child is effectively 'taken' from the parent by court order [citation]; however, the parent's later voluntary inaction may constitute a leaving with intent to abandon the child." (*In re Marriage of Jill & Victor D.* (2010) 185 Cal.App.4th 491, 504.)

Sergio relies primarily on *In re Jacklyn F.* (2003) 114 Cal.App.4th 747 (*Jacklyn F.*), in which the court concluded that a seven-year old who was involuntarily removed from her mother's custody and placed in a guardianship with her grandparents over the mother's objection had not been "left" by the mother. (*Id.* at pp. 749-750, 756.) "[The mother] contested the grandparents' efforts to secure a court order taking custody of the minor from her. Once the guardianship was granted, [the mother] was no longer legally entitled to custody of the minor without further court order. At such point, the minor's custody status became a matter of judicial decree, not abandonment. We conclude that the [mother's] conduct following the granting of the guardianship—which included sending 'stacks' of letters to the minor but failing to visit her—did not constitute 'parental nonaction' amounting to a leaving." (*Id.* at p. 756.)

The decision in *Jacklyn F.* is distinguishable because the parent challenging the finding of abandonment had actively opposed the court order resulting in the loss of custody. Here, by contrast, Sergio allowed a default to be taken against him in the divorce proceeding, and did not thereafter follow through with the court-ordered mediation necessary for him to secure visitation rights. The court in *Jacklyn F.* did "not discount the possibility that, under different circumstances, it might be proper to conclude that a parent has 'left' a child within the meaning of section 7822 despite court intervention." (*Jacklyn F.*, *supra*, 114 Cal.App.4th at p. 756.)

Closer to the facts of this case is *Amy A.*, *supra*, 132 Cal.App.4th at page 70, in which the father argued on appeal that a family court order granting custody to the mother in a divorce proceeding precluded a finding he had "left" the child. The Court of Appeal rejected that claim and distinguished the case from *Jacklyn F.*, noting the father

7

had not appeared in the divorce proceeding that deprived him of custody, had made no attempt to seek modification of the custody order, and did not exercise what visitation rights were available under the order. (*Amy A.*, at p. 70.)

Sergio similarly failed to appear in the divorce proceeding or seek a modification of the custody and visitation orders. Although he claimed that his efforts to provide support and obtain visitation were thwarted because he did not have Jessica's contact information, he spoke to Jose in 2011. The trial court could reasonably infer that Sergio could have secured the information necessary to follow through with the support payments and mediation before the original petition to terminate his parental rights was filed on May 10, 2012, and that his failure to do so amounted to a "leaving."

Also instructive is the decision in *Allison C.*, *supra*, 164 Cal.App.4th 1004, in which the father struck the child's mother and was incarcerated for two years for domestic violence. (*Id*. at p. 1007.) He secretly saw the child at a relative's house after his release, but the mother put a stop to the unsupervised visits once they were discovered. (*Ibid*.) The father was then incarcerated for another offense. (*Ibid*.) After his release, although he was allowed weekly supervised visitation under the terms of a restraining order, his parole officer prohibited visitation after the mother asked that the father drug test twice a week to ensure the child's safety. (*Id*. at p. 1008.) The father's parole conditions also allowed mail and telephone contact with the parole officer's approval, but the father never sought this approval. (*Ibid*.) The trial court granted a petition by the stepfather to terminate the father's parental rights, based on a determination the father had left the child in the mother's custody for at least a year without communication or support. (*Id*. at pp. 1008-1009.)

The Court of Appeal affirmed the order, rejecting the father's argument that he did not "leave" the child as required under section 7822 because he did not voluntarily surrender control to the child's mother: "We conclude substantial evidence supports the trial court's finding he did just that. In the summer of 2001 father, by his voluntary act of domestic violence, left [the child] in mother's care and custody. Thereafter, he never sought to take parental responsibility for [the child's] care, and instead chose to let the

8

child stay with mother. In other words, he was content to leave to mother all real parental responsibility for [the child]. His actions underlying his incarcerations for domestic violence, burglary, and driving under the influence were voluntary, and in any case, 'being incarcerated does not, in and of itself, provide a legal defense to abandonment of children.' ([*Rose G.*, *supra*, 57 Cal.App.3d at p. 424].) Even when father was out of prison in 2003 and routinely visited [the child] at his brother's house, he did so secretly, rather than seeking custody or visitation rights. Mother's efforts to curtail father's communication with [the child], while relevant to an assessment of whether father *intended* to abandon the child by noncommunication . . . , do not negate the reality he never sought to take custody or care of the child after mid-2001. In sum, he voluntarily abdicated the parental role." (*Allison C.*, *supra*, 164 Cal.App.4th at pp. 1011-1012.)

So too here. Sergio committed a voluntary act of domestic violence that resulted in the minor being placed in Jessica's sole physical custody. This volitional act led to his incarceration and the restraining orders against him. He did not take steps to try to modify the judgment in the divorce case to allow for visitation or joint physical custody. Substantial evidence supports a finding that Sergio left the minor in her mother's care from 2008 until the time the petition to terminate his rights was filed in 2011.

C. *Intent to Abandon*

Sergio also challenges the trial court's finding he intended to abandon the minor. We conclude substantial evidence supports the court's determination that this element was satisfied.

The intent to abandon required under section 7822, though subjective in nature, "may be found on the basis of an objective measurement of conduct, as opposed to stated desire." (*Rose G.*, *supra*, 57 Cal.App.3d at p. 424.) "In determining [a parent's] intent to abandon, the trial court may consider not only the number and frequency of his or her efforts to communicate with the child, but the genuineness of the effort under all the circumstances." (*In re B. J. B.* (1986) 185 Cal.App.3d 1201, 1212 (*B. J. B.*).) "The parent need not intend to abandon the child permanently; rather, it is sufficient that the

9

parent had the intent to abandon the child during the statutory period." (*Amy A.*, *supra*, 132 Cal.App.4th at p. 68.)

Intent to abandon is a question of fact for the trial court. (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1016.) To facilitate this determination, section 7822, subdivision (b), sets forth a presumption affecting the burden of producing evidence on the issue: "The failure to . . . provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents." (See *Rose G.*, *supra*, 57 Cal.App.3d at pp. 419-420.) "The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption. Nothing in this section shall be construed to prevent the drawing of any inference that may be appropriate." (Evid. Code, § 604.)

Here, the trial court found the presumption of an intent to abandon under section 7822, subdivision (b), had been rebutted by evidence that Sergio had been in custody and had been the subject of a restraining order. But while the presumption was no longer operative, the evidence that Sergio had failed to provide support or communicate for so many years did not become irrelevant and was sufficient to support the court's finding of an intent to abandon regardless of the presumption. (See *B. J. B.*, *supra*, 185 Cal.App.3d at p. 1212 ["[E]ven were we to assume that appellant's testimony served to overcome the statutory presumption [citation], the evidence nevertheless is sufficient"].) The trial court noted Sergio had made only token efforts to support the minor, a factual finding that permitted the court to declare the minor abandoned. (§ 7822, subd. (b).)

As the court noted in *B. J. B.*, *supra*, 185 Cal.App.3d at pages 1212-1213: "Assuming for purposes of argument only that the presumption afforded by subdivision (a)(1) is one affecting only the burden of production and that appellant's evidence was sufficient to make it 'disappear,' still the undisputed fact of six years' noncommunication

10

and nonsupport did not lose its effect as ordinary evidence. The record contains more than ample evidence on which to predicate a finding of intent to abandon, especially since appellant and B. have lived in the same geographical area throughout the six-year period; appellant has acquaintances in common with the child's mother; and all of the affected persons have had substantial dealings with public agencies from which assistance in locating one another would presumably have been forthcoming if requested. Appellant's evidence fell far short of compelling a conclusion that it was impossible for him to locate his child. The trial court was entitled to find that his efforts to do so were at best perfunctory, and it was not required to credit his protestations of continuing parental interest . . . ."

Sergio's contact with the mother was circumscribed by the restraining orders and, as a practical matter, limited during the time he was incarcerated. But these circumstances did not prevent him from making more forceful efforts to provide support and modify the operative orders in a manner that would have enabled him to have some contact with his daughter. Jessica testified that while she did not seek Sergio out, he could have found her if he had expended the effort, and the trial court was entitled to credit this testimony. Sergio was contacted by Jose in 2011, but, viewing the evidence in the light most favorable to the judgment, did not ask to see the minor or obtain Jessica's contact information. It was reasonable for the trial court to conclude that while Sergio had taken some modest steps to learn of his daughter's whereabouts, he basically acquiesced to a situation in which Jessica and her new husband Jose were raising the minor with no support from Sergio. It was only when a legal proceeding was filed that he showed a real interest in establishing a relationship with the minor, whom he had not seen since she was a year old. (See *Adoption of Oukes* (1971) 14 Cal.App.3d 459, 466-467.)

## III. DISPOSITION

The judgment (order terminating parental rights of appellant Sergio M.) is affirmed. Costs on appeal are awarded to respondent Jose M.

11

_____

NEEDHAM, J.

We concur.

_____

JONES, P.J.

_____

SIMONS, J.