Filed 5/8/19

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re H.D. et al., Minors. | |
| J.D., Petitioner and Respondent, v. S.D., Objector and Appellant. | E070576 (Super.Ct.Nos. HEA1700176, HEA1700177) OPINION |

APPEAL from the Superior Court of Riverside County. Kathleen Jacobs, Temporary Judge. (Pursuant to Cal. Const., art. VI, §21.) Reversed.

Julie A. Duncan for Objector and Appellant.

Zeiler Law Group and Kerry P. Zeiler for Petitioner and Respondent.

1

Recognizing she suffered from addiction, S.D. (mother) agreed to let her ex-husband, E.D. (father), assume full custody of their two daughters—who had previously lived primarily with her—until she could get clean and sober. She underwent treatment, and 14 months later, sought to regain partial custody in family court. About a week after mother filed for custody, father's wife, J.D. (stepmother), filed petitions to free the girls from mother's custody and control based on abandonment, so stepmother could adopt them. (Fam. Code, § 7822, subd. (a)(3), unlabeled statutory citations refer to this code.) The trial court granted the petitions and terminated mother's parental rights. The court concluded mother had abandoned her daughters because she had failed to communicate with or financially support them for at least one year.

Mother argues the evidence is insufficient to support the court's ruling, and we agree. Under section 7822, subdivision (a)(3), a parent abandons their child when they leave the child with the other parent for a year, with no communication or financial support, "*with the intent . . . to abandon the child*." (Italics added.) Mother's failure to communicate with and financially support her daughters was not due to any intent on her part to abandon her daughters. Indeed, mother did the opposite of abandon her children, she diligently treated her addictions before trying to regain custody. Because the record contains uncontradicted evidence of her abiding desire and plan to reunify with her children, we reverse the judgment terminating her parental rights.

2

# I

## FACTS

Mother and father were married for three years and have two daughters together, H.D., who was born in 2009 and is now nine years old, and E.D., who was born in 2012 and is now six. After they divorced in 2012, the court awarded primary custody to mother, with visits for father three weekends a month. In 2014, father began dating J.D. and they eventually married in 2016.

In the spring of 2015, the girls lived with father and stepmother for a month while mother participated in alcohol addiction treatment in Arizona. In June 2015, mother and father obtained a revised custody order, agreeing to shared custody. Father would take care of the girls while mother was working.

In March 2016, father began to suspect mother was using drugs and sought an ex parte order granting him temporary sole custody of the girls. Mother acknowledged she was actively using methamphetamine and agreed to a stipulated custody order giving father sole custody on a temporary basis. Under that order, which was issued in April 2016 and titled "stipulation and order for temporary custody and visitation," mother was allowed visitation "upon mutual agreement between the parties." According to father, mother tried to arrange visits or at least speak with the girls three times in the following month, but he refused based on his family therapist's advice that allowing mother to contact or visit would be stressful for the girls. A few weeks later, in mid-May, mother left a voice message for the girls on father's phone and texted father asking him to play it

3

for them. Father again refused, responding that the therapist did not want the girls to listen to her message "because you are trying to guilt the girls into calling." At trial, mother said she stopped trying to contact or see the girls after that because she felt she was "hitting a wall with [father]." She didn't want fights with him to be a "trigger for her addictions" so she decided to focus on getting healthy and fighting for custody in family court.

In August 2016, father returned to family court and sought a new custody and visitation arrangement. Mother appeared before the court and said she didn't want to fight with father and would "sign whatever you have." The resulting "stipulation and order on request for order" granted father "sole legal and sole physical custody" of the girls, with mother having "professionally supervised visitation at her cost, upon mutual agreement of the parties." Under the order, mother agreed to attend substance abuse meetings, enroll in substance abuse and parenting counseling, and submit to hair follicle drug testing at father's request. If she tested positive, her visitation rights would be suspended until she furnished a negative test.

In December 2016, the court ordered mother to pay $893 a month in child support.

For the next year, mother underwent treatment for alcohol and methamphetamine addiction. In December 2016, she completed 30 days of residential rehabilitation in Lancaster. After that, she participated in five months of sober living followed by six months of an "intensive outpatient" program.

4

On December 4, 2017, mother filed a request to modify the August 2016 custody order. She sought a shared custody arrangement where she would care for the girls Wednesday nights and every other weekend.

On December 15, 2017, stepmother filed petitions to free the girls from mother's custody and control under section 7822 so she could adopt them. Her petitions alleged the girls had been residing with her and father for more than a year and mother had not been in contact with the girls or paid support for the preceding one-year period. Mother opposed the petitions and submitted a declaration explaining her recent absence from the girls' lives. She told the court she had never intended to abandon her daughters—that she had agreed to the 2016 custody orders because she believed they were only temporary and that she could regain custody once she got clean. She said she had been sober for 14 months and was trying to reunify with her daughters in family court. "It has been a long haul, but I completed and continue to complete the work, to stay on track. I did not want to come in and out of our daughters' lives, so I made sure I could maintain sobriety before coming back to [family] court to re-establish my parenting rights with our girls." She said she was willing to attend counseling with the girls and would agree to supervised visits if the court found that was necessary. "All I want is to return to being a co-parent to our girls."

Mother explained she had not planned to "just up a[nd] leave our girls" when she went into treatment, but father had denied her requests to speak with the girls while they were in his custody. She said father had led her to believe he would let her have a

5

relationship with the girls while she was seeking treatment if she agreed to give him full custody. She realized after she agreed to the custody arrangement, however, that he "had no intention of allowing me to have a relationship with the girls at that point." "I would NEVER abandon our children. However, at the same time, I could not allow [father] to be a further trigger for my addiction, so I knew I had to get clean and strong again, so that I could come back and fight him for my rights to co-parent our girls." Mother explained she had been the girls' primary caregiver during her marriage to father and for years after the divorce. "I know that I have only myself to blame for losing all that time with our children, but I wanted to be the parent they remembered, and I can say that I presently am . . . I admit that I made mistakes in the past and I take full responsibility for them, but I have been their mother for much longer than [stepmother] has been married to the girls' father, so she should not be permitted to replace me. I am their mother, who gave birth to those girls, and no other mother can love them as much as I do. [¶] While I appreciate [her] caring for our daughters in my absence, during my effort to become well, . . . our children have only 1 mother, and that is me. I respectfully request that the Court deny [stepmother's] request to terminate my parental rights and to adopt my daughters . . . and allow the custody of our children to be worked out in the family law action." Mother attached to her declaration documentation from the treatment programs she had attended, clean hair follicle test results from December 28, 2017, and a printout of her text conversations with father from the spring of 2016 when he refused to let her contact the girls.

6

Mother's grandfather filed a declaration asking the court to deny stepmother's petitions. He said father had been letting the girls stay with him and his wife, the maternal great-grandmother, every other weekend, but then "banned" all overnight visits when mother filed to regain custody. He said mother had gotten "clean and sober" to "establish[] her way back into the children's lives" and the girls "deserve[d] their own mother in their lives."

In February 2018, mother paid $1,000 in child support. The following month, she paid another $1,000.

A probation officer interviewed the family under section 7851 and submitted a report recommending the court deny stepmother's section 7822 petitions.[1] During her interview, mother told the probation officer she had fully participated in treatment and had been sober for 15 months. She was living with her fiancé and was pregnant with his child. She was currently financially dependent on him, but planned to seek employment after her child was born. Thanks to his help, she had recently been able to provide some financial support to her daughters. She admitted she had made no efforts to communicate with the girls since May 2016 and explained she had wanted to get sober before reunifying. "[S]he felt it was not suitable to have involvement in her daughter's lives until she achieved sobriety and learned the tools necessary to cope with her substance abuse issues." Father told the probation officer he believed mother's failure to

---

[1] Section 7851 requires "[t]he juvenile probation officer . . . [to] render to the court a written report . . . with a recommendation of the proper disposition to be made in the [section 7822] proceeding in the best interest of the child."

7

communicate with the girls or pay any financial support for a period of a year "demonstrates her willful absence" from her daughters' lives.

H.D., who was then eight years old, told the probation officer she wanted stepmother to adopt her. She could not remember the last time she talked to mother, and she liked the way things were, living with father and stepmother. E.D., who was five years old at the time, was too young to understand the nature of the custody proceedings, but she did say she regards stepmother as her "mom" and mother was "not a part of her family."

The probation officer recommended against terminating mother's parental rights. The officer concluded mother did not intend to abandon her daughters when she left them in father's care, rather she had intended to treat her addictions so she could reenter their lives in a healthy manner.

The court held the hearing on stepmother's petitions in March 2018. Father and stepmother testified they had no contact with mother after the August 2016 custody order and she had been absent from the girls' lives for over a year. Mother testified she never intended to abandon her daughters, but had instead wanted to ensure before reentering their lives she wouldn't relapse. She said when she stipulated to the most recent custody order, she was under the impression that if she treated her addictions she would be able to resume caring for the girls. She acknowledged she owed approximately $19,000 under the December 2016 support order, but explained she hadn't been able to pay child support because she was unemployed. She said her dental assistant license is still active

and she plans to start working again after her son is born. She and her fiancé had recently moved from Palmdale to Murrieta to be in the same city as her daughters. They had rented a three-bedroom home so the girls could have their own room and had purchased a large SUV big enough for all three children.

Mother's fiancé testified mother had told him within a week of their meeting that she was trying to reunite with her daughters. He said she talked about her girls all the time and he could tell reunifying with them was very important to her. He said it had been her idea to move to the same city as the girls and get a larger place so the girls could live with her.

Mother's great-aunt also testified that mother had never intended to abandon her daughters and "wanted the girls to be back in her life." She said mother had wanted to go to family court to seek custody as early as June 2017, but had felt she should get "her criminal [record] taken care of" before doing so. The great-aunt had helped mother pay her outstanding criminal fines so she could try to regain custody of her daughters.

Mother's grandparents also testified on her behalf. They had been very involved in the girls upbringing, spending holidays and every other weekend with them, until mother tried to regain custody. The grandfather said mother had asked him in April 2016 if she could speak to the girls when they were staying with them. When he asked father if that would be okay, father said no. The grandparents continued to watch the girls every other weekend while mother was in treatment, and they gave some financial support to father—they contributed by purchasing the girls' school lunches and helping father pay

9

for daycare. The grandmother said father became "very upset" when mother tried to regain custody, closed the grandparents' school lunch account, and pulled back all the pictures of the girls he had shared with them through their phones. The grandparents wanted to help mother reunify with her daughters and had assisted her in finding and paying for an attorney to oppose stepmother's petitions. The grandmother said mother had been "very close" with her daughters before she lost custody.

The court concluded mother had abandoned her daughters within the meaning of section 7822, subdivision (a)(3). The court explained it did not believe mother had intended to *permanently* abandon the girls; however, the fact she failed to communicate with or financially support her daughters for over a year demonstrated she had intended to abandon them *during that period*. Mother timely appealed.

## II

## DISCUSSION

A. *General Legal Principles*

The Family Code authorizes a court to terminate parental rights if the parent has abandoned their child. (§§ 7803, 7822.) Relevant here, a parent abandons a child if they have "left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication . . ., with the intent . . . to abandon the child." (§ 7822, subd. (a)(3).) "Thus, a section 7822 proceeding is appropriate where 'three main elements' are met: '(1) the child must have been left with another; (2) without provision for support or without communication from

10

. . . his parent[ ] for a period of one year; and (3) *all of such acts are subject to the qualification that they must have been done 'with the intent on the part of such parent . . . to abandon [the child].'"* (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010 (*Allison C.*), quoting *In re Cattalini* (1946) 72 Cal.App.2d 662, 665 (*Cattalini*), italics added.)[2]

The failure to communicate or provide financial support for a one-year period is presumptive evidence of an intent to abandon, and "token efforts" to support or communicate will not overcome the presumption. (§ 7822, subd. (b).) However, "[t]he fact that a parent has not communicated with a child . . . or that the parent intended to abandon the child does not become material . . . unless the parent has 'left' the child" within the meaning of section 7822. (*In re Jacklyn F.*, *supra*, 114 Cal.App.4th at p. 754 (*Jacklyn F.*).)

A finding of abandonment "shall be supported by clear and convincing evidence" (§ 7821), and we apply a substantial evidence standard of review to the trial court's findings. (*Allison C.*, *supra*, 164 Cal.App.4th at p. 1009.)

Mother argues the record contains insufficient evidence she "left" her daughters with father or she intended to abandon them. We agree.

---

[2] "Section 7822 became operative in 1994. (Stats. 1992, ch. 162, § 10, p. 464.) The language that currently appears in section 7822 . . . previously appeared in nearly identical form in former Civil Code section 232, subdivision (a) (Stats. 1961, ch. 1616, § 4, p. 3504), and prior to that, in former Welfare and Institutions Code section 701 (Stats. 1937, ch. 369, § 701, p. 1031)." (*In re Amy A.* (2005) 132 Cal.App.4th 63, 68, fn. 4.) Courts continue to rely on the cases decided under the previous statutory provisions interpreting the nearly identical language, and we do so here. (E.g., *ibid.*; *In re Jacklyn F.* (2003) 114 Cal.App.4th 747; *Allison C.*, *supra*, 164 Cal.App.4th 1004.)

### B. *Mother Did Not "Leave" Her Daughters*

Leaving a child in the care of another does not require a literal *physical desertion*; instead, "[c]ase law consistently focuses on the voluntary nature of a parent's *abandonment of the parental role*." (*In re Amy A.*, *supra*, 132 Cal.App.4th at p. 69, italics added.) For example, a parent voluntarily abandons their parental role if they choose to commit criminal acts that result in incarceration. (*Allison C.*, *supra*, 164 Cal.App.4th at pp. 1011-1012.) However, a parent does not voluntarily abandon their parental role if the other parent takes the child away or a court places the child in the custody of another. (*Cattalini*, *supra*, 72 Cal.App.2d at p. 665; *Jacklyn F.*, *supra*, 114 Cal.App.4th at p. 756.)

The "leaving must be voluntary and abandonment does not occur when the child is taken from parental custody *against the parent's wishes*." (*In re George G.* (1977) 68 Cal.App.3d 146, 160, italics added.) "Abandonment is not established by acts of relinquishment committed under circumstances of coercion." (*In re Jones* (1955) 131 Cal.App.2d 831, 834-835.) In *Matter of Cozza* (1912) 163 Cal. 514, the court concluded the mother did not "leave" her daughter in the care and custody of another when the child was taken from her "against her wishes" and she "endeavored . . . to secure the return of the child." (*Id.* at pp. 528-529.) However, if after a child is taken against the parent's wishes that parent does not endeavor to secure the child's return but instead fails to act, their inaction can "convert[]" the earlier taking into a leaving. (*Jacklyn F.*, at p. 755 ["the

12

leaving requirement for abandonment may be satisfied by evidence of parental nonaction"]; *In re Jack H.* (1980) 106 Cal.App.3d 257, 264.)

The facts of this case fall somewhere in between a judicial taking and a voluntary relinquishment of the parental role. Although mother stipulated to the custody orders placing the girls with father, she did so only after father went to court ex parte to obtain custody based on her active alcohol and methamphetamine addictions. Faced with the likely prospect of an involuntary judicial taking, mother made things easier for everyone by agreeing to the custody order and to seek treatment for her addictions. Moreover, as soon as father assumed full custody, mother endeavored to regain custody by immediately seeking treatment, getting sober, and returning to court to seek modification of the custody order. The record therefore does not support a finding she voluntarily relinquished her parental role, instead it suggests she temporarily suspended her parental duties to address the obstacles that were hindering her ability to fulfill her role as the girls' mother.

To be clear, our conclusion does not mean that every parent who loses custody of their child because of addiction has not "left" that child. If mother had not been as diligent as she was in seeking treatment, our conclusion might be different. However, the law should not penalize those parents who acknowledge and then earnestly address their addictions by deeming their agreement to seek treatment a desertion of their child.

C.    *Mother Never Intended to Abandon Her Daughters*

"'The relationship of a natural parent to her children is a vital human relationship which has far-reaching implications for the growth and development of the child.'" (*In re George G.*, *supra*, 68 Cal.App.3d at p. 165.)  While a parent need not intend to abandon their child permanently for the court to employ the "drastic remedy" of terminating their parental rights under section 7822, subdivision (a)(3), they must intend to abandon their child for at least one year.  (*In re George G.*, at p. 165; *In re Amy A.*, *supra*, 132 Cal.App.4th at p. 68, citing *In re Daniel M.* (1993) 16 Cal.App.4th 878, 885 ["it is sufficient that the parent had the intent to abandon the child during the statutory period"].)

Here, the trial court based its conclusion that mother intended to abandon her daughters for a year on her failure to communicate with or support them during that time period.  While it is undisputed mother failed to contact or financially support her daughters for over a year—from mid-May 2016 (her last attempt to contact the girls) to February 2018 (when she gave her first child support payment of $1,000)—under section 7822, each act—leaving the child, failing to communicate, and failing to support—must have been done with the intent to abandon the child.  Thus, "[t]he crucial issue here then was whether or not the alleged acts of [mother] were committed by [her] 'with the intent to abandon' [the girls]." (*Cattalini*, *supra*, 72 Cal.App.2d at p. 668.)

The record contains uncontradicted evidence mother never intended to abandon her girls.  She testified she believed she was letting father assume custody only for so

14

long as it took her to treat her addictions and return to family court to seek modification of the custody arrangement. Her fiancé, great-aunt, grandmother, and grandfather all corroborated this testimony with their own observations of mother's desire to reunify with her daughters. The weightiest evidence of intent, however, was mother's actions. After becoming and remaining sober, mother wasted no time in returning to family court and seeking to regain custody.

Regarding her failure to contact and support her daughters, the evidence demonstrates she was *unable* to do so, not that she didn't want to or didn't care. It is undisputed mother tried to maintain contact when she lost custody (both through father and through her grandfather), but father did not want the girls interacting with her. While we do not fault father for trying to protect what he saw as his daughters' best interests, it would be unfair to treat his decision to prevent contact as evidence that mother didn't care to talk to her daughters. It is also undisputed mother was unemployed during the months she failed to pay child support and was therefore unable to comply with the support order. A parent's failure to support a child when they do not have the ability to do so does not, by itself, prove intent to abandon. (See *In re Baby Boy M.* (1990) 221 Cal.App.3d 475, 482; *In re T. M. R.* (1974) 41 Cal.App.3d 694, 698, fn. 2 [mother's failure to support her children was not an issue because it was undisputed she was financially unable to do so during her incarceration]; *Adoption of Oukes* (1971) 14 Cal.App.3d 459, 467 ["[f]inancial inability may excuse the failure to send any funds for support of the children"]; see also *Cattalini*, *supra*, 72 Cal.App.3d at p. 667 [when a

15

parent's failure to provide financial support "was by reason of the inability to do so, less evidence than under other circumstances would naturally be required to overthrow [the] presumption" of intent to abandon].) Mother's grandparents were providing some financial and much caretaking support while she was in treatment, and, significantly, as soon as she was able to afford it, she sent her daughters $2,000. (See *Adoption of R. R. R.* (1971) 18 Cal.App.3d 973, 984 [the failure to financially support was not accompanied by an intent to abandon where mother "was without the wherewithal to provide such support" and "her relatives had voluntarily undertaken to provide for [the child's] care and support"].)

Here, the trial court relied solely on the presumptive evidence of intent to abandon—failure to communicate or provide financial support—and ignored the overwhelming undisputed evidence mother actually never intended to abandon her daughters and was actively working to reunite with them. Section 7822 is clear— termination of parental rights is unwarranted if the failure to communicate or provide financial support is not accompanied by an intent to abandon. (§ 7822, subd. (a)(3); *Cattalini*, *supra*, 72 Cal.App.2d at p. 665 [the acts required for abandonment "are subject to the qualification that they must have been done 'with the intent on the part of such parent or parents to abandon'"].)

Stepmother argues mother's motivation to rehabilitate was selfish and had nothing to do with reunification. According to stepmother, mother focused on herself after getting out of rehab—getting engaged and acquiring a larger home and vehicle. We

16

cannot agree with that characterization. It overlooks the clear evidence of mother's desire to reunify—the fact she sought to regain custody as soon as she had been sober for a year, paid $2,000 in child support as soon as she was able, and moved to the same city as her daughters. We conclude mother's attempts to contact her daughters, her diligence in treating her addictions, her attempt to regain custody in family court, and her payment of support when she was able preclude a finding of abandonment.

## III

## DISPOSITION

We reverse the judgment.

CERTIFIED FOR PUBLICATION


SLOUGH
J.

We concur:


MILLER
       Acting P. J.


CODRINGTON
     J.

17